**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| **PRIMROSE LA SARA, LLC** | § | **CASE NO. 16-30822** |
| | § | **CHAPTER 7** |
| | § | |
| **LA SARA OPERATING COMPANY, LLC** | § | **CASE NO. 16-30453** |
| | § | **CHAPTER 7** |
| | § | |
| **DEBTORS** | § | **CHIEF JUDGE DAVID R. JONES** |

**TRUSTEE'S EXPEDITED MOTION FOR: (a) AUTHORITY TO SELL PROPERTY FREE AND CLEAR OF LIENS AND CLAIMS BY AUCTION, (b) APPROVAL OF BIDDING PROCEDURES AND DESIGNATION OF STALKING HORSE BIDDER, (c) ESTABLISHMENT OF INSPECTION PROCEDURES, and (d) MOTION TO EXTEND DEADLINE TO ASSUME OR REJECT EXECUTORY CONTRACTS AND FOR AUTHORITY TO, ASSUME AND ASSIGN EXECUTORY CONTRACTS IN CONNECTION WITH SALE**

---

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN TWENTY-ONE (21) DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

*AN EXPEDITED HEARING IS SET ON THIS MOTION IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EXPEDITED CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.*

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

*AN EXPEDITED HEARING ON THE RELIEF SOUGHT HEREIN IS SET FOR NOVEMBER 8, 2016 AT 1:30 PM. CENTRAL TIME AT 515 RUSK, 4TH FLOOR, COURTROOM 400, HOUSTON, TEXAS 77002*

To the Honorable David R. Jones,
**Chief United States Bankruptcy Judge**:

COMES NOW Eva S. Engelhart, Chapter 7 Trustee ("Trustee") of the above-referenced

bankruptcy estates and respectfully represents as follows:

## A. Jurisdiction, Venue and Constitutional Authority

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (N) and arises in and/or under Title 11. The statutory predicate for the relief sought herein is 11 U.S.C. § 363, 365 and 105 and, Federal Rule of Bankruptcy Procedure 6004.

2.      Venue is proper under 28 U.S.C. §§ 1408 and/or 1409.

3.      This Court has constitutional authority to enter a final order regarding this matter.   The matters raised herein have no equivalent in state law, thereby rendering the Supreme Court's opinion in *Stern v. Marshall* inapplicable.   *See In re Carlew*, 469 B.R. 666, 672 (Bankr. S.D. Tex. 2012) (discussing *See Stern v. Marshall*, 131 S.Ct. 2594 (2011)).   In the alternative, this motion concerns essential bankruptcy matters which trigger the public rights exception.   *See Id.*

## B.   Procedural and Factual Background

4.      On January 28, 2016, La Sara Operating Company, LLC ("La Sara") filed for voluntary Chapter 7 bankruptcy protection.   On the same date, the Trustee was appointed interim Trustee and, having since accepted the appointment and posted the requisite bond, has become permanent Trustee.

5.      On February 17, 2016, Primrose La Sara, LLC ("Primrose") filed for voluntary Chapter 11 bankruptcy protection and proceeded to operate as a Debtor-in-Possession until conversion of the case on June 1, 2016.   On the same date, the Trustee was appointed interim Trustee and, having since accepted the appointment and posted the requisite bond, has become permanent Trustee.

6.      Pursuant to that certain Asset Purchase Agreement dated November 22, 2010 and that certain Conveyance, Assignment, and Bill of Sale effective December 31, 2010 (the "Blake Conveyance"), Primrose, formerly Risco La Sara, LLC, acquired from BLAKEnergy, Ltd. ("Blake")[1] a 71.5% working

---

[1]      Blake is owned and controlled by Mr. David Blake (hereinafter also referred to as "Blake").

interest in two (2) mineral leases, commonly referred to as the "Crane Mallard Lease" and the "Roadrunner Lease" (hereinafter also referred to as the "Leases" or the "Willacy Field") which, at the time, encompassed approximately 3,772.7 acres[2] in Willacy County, Texas, together with associated property, fixtures, improvements, equipment, well files and contract rights, including a license agreement for seismic data. The Blake Conveyance was recorded in the Willacy County, Texas, Real Property Records on January 21, 2011. The Crane Mallard Lease was originally dated December 1, 2001, and was between Fausto Yturria Jr., *et al.* and Swift Energy. The Crane Mallard Lease covers 2,975.8 acres in Willacy County, Texas. The RoadRunner Lease was originally dated April 11, 2005, and was between Fausto Yturria Jr., *et al.* and Blake and initially covered 796.9 acres and is immediately adjacent to the acreage involved with the Crane Mallard lease. Thereafter, RoadRunner was amended effective as of March 1, 2011 to, among other things, expand its total acreage from approximately 769.9 to approximately 2,975.8 acres.

7.      At the time of the sale by Blake to Risco La Sara (now Primrose) the remaining 28.5% working interest in the Willacy Field, was owned 15% by Blake and 13.5% by Amerril Energy, LLC ("Amerril"). Blake has since retained its working interest; however, pursuant to that certain Cross Assignment and Bill of Sale (the "Amerill Assignment"), Amerril transferred its working interest to Primrose Petroleum, LLC ("PRIMPET"). The Amerril Assignment bears the date April 2, 2014, and was filed in the Willacy County, Texas Real Property Records on April 15, 2014.

8.      Up until January 7, 2016, La Sara was the designated contract operator of the Willacy Field. A Model Form Operating Agreement dated January 5, 2011 (the "JOA"), governs the rights and obligations of the working interest owners and the operator of the Willacy Field. A Memorandum of Operating Agreement and Financing Statement of the JOA was filed in the Willacy County Real Property Records on January 21, 2011 (the "Memorandum of JOA"). After January 7, 2016, the operator of the Willacy Field was MK Operating Company, LLC ("MK Operating").

---

[2]         As described below, the Willacy Field acreage was subsequently expanded to approximately 6,000 acres.

9.      On October 29, 2015, an Assignment and Bill of Sale was recorded in the Willacy County, Texas, Real Property Records, whereby Primrose conveyed a 37% of the 8/8ths undivided interests in and to the Crane Mallard and RoadRunner Leases to LaSara Ventures 1, LLC ("LSV1") (hereafter that transaction is referred to as the "LSV1 Transfer").   As a result of the LSV1 Transfer, the Primrose Estate retained a 34.5% interest in the 8/8ths undivided interests in the Crane Mallard and RoadRunner Leases (the "34.5% WI").

10.      On August 19, 2016, the Trustee, filed Adv. No. 16-03187, *Eva S. Engelhart, Trustee of the Chapter 7 Estate of Primrose La Sara, LLC and Eva S. Engelhart, Trustee of the Chapter 7 Estate of La Sara Operating Company, LLC v. LaSara Ventures 1, LLC; Primrose Petroleum, LC; MK Operating Company, LLC; Huisache E & P Company, LLC and Miles Redfield Klepper* (the "Adversary Proceeding") which is pending before this Honorable Court.   On October 20, 2016, the Trustee filed her First Amended Complaint in the Adversary Proceeding.   See attached **Exhibit A** (the "Amended Complaint").   By way of summary only, the Amended Complaint seeks recovery of the LSV1 Transfer under both state and federal fraudulent transfer and preference theories; enforcement of an operator lien by the La Sara estate as against the 37% working interest transferred to LSV1 and the 13.5% transferred to PRIMPET; recovery of any pre- or post-petition production revenue due to Primrose; recovery of claims for breach of the duties of loyalty and/or care, as well as breach of fiduciary duty against Miles Klepper; turnover of books and records of Primrose; and damages against Huisache E & P for trespass and/or conversion of reserves associated with the Willacy Field (collectively the "Litigation Claims").

11.      The Leases are subject to identical provisions requiring continuous drilling obligations (the "Continuous Drilling Obligations").   Under the Continuous Drilling Obligations, the drilling of a new well must be commenced within 120 days of the conclusion of drilling of the last well drilled (subject to the extensions more fully discussed below).   Satisfaction of the Continuous Drilling Obligations maintains the Leases beyond their primary term, provided 120 days did not elapse between the conclusion of drilling of a well and commencement of actual drilling operations on the next well.   Failure to comply with the

Continuous Drilling Obligations may result in the loss of the remainder of the oil and gas lease acreage (and all rights as to depths beyond 100 feet below the deepest producing formation) which is (a) not currently assigned to a production unit and (b) producing in paying quantities.   In essence, such failure may, in effect, result in a forfeiture of the right to explore for new hydrocarbons on the Leases.

12.     The Crane Mallard Lease was amended effective April 27, 2009 (the "Crane Mallard Amendment") to include 2 new provisions with respect to the Continuous Drilling Obligations under the Crane Mallard Lease:

- a "banked time" provision, which provides that if the drilling of a well is commenced prior to the 120-day drilling deadline, the number of days remaining in such 120-day period would be credited as "banked days" (the "Banked Days") which could thereafter be used to enlarge the 120-day period to drill a subsequent well if such drilling was not commenced within the requisite 120-day period; *provided, however*, that Banked Days cannot exceed 365 days; and

- a provision allowing the drilling of additional wells on the Crane Mallard Lease, the Roadrunner Lease, and a third lease to satisfy the Continuous Drilling Obligations.

13.     Yturria #24 Deep, the last prepetition well drilled on the Crane Mallard Lease, reached total depth on November 20, 2015.   After commencing the drilling of the Yturria #47 well on April 30, 2016, a total of 4 Banked Days were accrued on the Crane Mallard Lease.   Accordingly, the drilling of the next well on the Crane Mallard Lease had to have been commenced on or before October 3, 2016.   MK Operating commenced a well, the Yturria #48, on the Crane Mallard Lease on September 27, 2016.

14.     The Roadrunner Lease was amended in 2006, 2009, and 2011.   The 2006 amendment enlarged the primary term from one to two years.   The 2009 amendment echoed the Crane Mallard Amendment set forth above.   The 2011 amendment increased the acreage covered by the Roadrunner lease from approximately 769.9 to approximately 2,975.8 acres and provided for 2 additional provisions with respect to the Continuous Drilling Obligations under the Roadrunner Lease:

- a provision acknowledging that Risco La Sara (now Primrose) previously accumulated 365 Banked Days, used 346 of the 365 Banked Days, and thus had   19 Banked Days remaining; and

- a provision that an additional 154 Banked Days could be earned by commencing the drilling of a well on the Roadrunner Lease before March 9, 2012 (which would then increase the total Banked Days to 201).

15.      Yturria #32RR, the most recent prepetition well drilled on the Roadrunner Lease, reached total depth on October 19, 2015.   After commencing the drilling of the Yturria #29D well and the Yturria #28D well on February 14, 2016 and February 20, 2016, respectively, a total of 154 Banked Days were accrued on the Roadrunner Lease.   Accordingly, if all 154 Banked Days are utilized before drilling the next well, such drilling must commence by December 21, 2016.

### C.   Motion for Authority to Sell Property Free and Clear of Liens and Claims by Auction, Approval of Bidding Procedures and Designation of Stalking Horse Bidder

16.      The Trustee desires to sell the Primrose Estate's 34.5% working interest in the Willacy Field and the Litigation Claims (collectively the "Assets") to the highest bidder at public auction. The Trustee, in her business judgment, believes that an auction of the Assets is the most appropriate means by which to maximize their value to each estate, versus continued the pursuit of the Adversary Proceeding for at least the following reasons:

A.      **The Value of the Assets Will be Diluted During Prosecution of the Adversary Proceeding**:  Under the JOA, each working interest owner is responsible for its proportionate share of costs of operations of the Willacy Field, including, but not limited to, costs associated with continuous drilling operations.  The failure of a working interest owner who has been properly presented with an authorization for expenditure ("AFE") to consent to, and fund, its share of a "lease saving operations" can lead to a forfeiture of its working interests in the Leases.  With regard to the Yturria #48, the Primrose estate's share was effectively carried by LSV 1, with no recourse to any assets of the estate beyond the estate's interest in Yturria #48 and any production therefrom, as authorized by the certain Order Granting Joint Emergency Motion to Authorized Financing and Operations entered on September 15, 2016 at Docket Number 101.  The estate's portion of the cost to drill, test and complete the Yturria #48 well was approximately $140,000. LSV1 had indicated that it is not willing to enter into the same arrangement for drilling of the next well on the RoadRunner Lease which must be commenced by December 21, 2016.  The Trustee anticipates receiving an AFE for the drilling of this new well in short order, after which the Primrose estate will have 30-days to consent thereto and fund it share of costs of drilling.   If the anticipated cost of the well due in December is similar to that of Yturria #48, the Primrose estate's proportionate share thereof will exceed $100,000.   The Primrose estate lacks sufficient resources to meet such an obligation and will require third party financing.   However, given the numerous legal issues involved with the Leases it is not reasonable to believe that traditional financing options are available.   Thus, the estate would be confined to obtaining financing from parties already interested in acquiring an interest in the Willacy Field.   Further, financing will undoubtedly not be

on the non-recourse terms associated with Yturria #48 and will result in the encumbrance of the Assets to the detriment of creditors.   Moreover, the continuous drilling operations, and costs associated therewith, are ongoing and will continue until resolution of the Adversary Proceeding and subsequent liquidation of whatever estate assets exist at that point.   During that time period the Primrose estate will have to incur additional debt to finance its obligations under the JOA, or face forfeiture of its interests in the Willacy Field.   The Adversary Proceeding is not currently set for trial.   The Trustee, in her business judgment, believes that that a sale by auction mitigates the danger of dilution of value of the Assets as a result of costs associated the Primrose estate's obligations under the JOA.

        B.      **The Lessors' Reservation of Rights**:   Proof of Claim Numbers fifteen (15) through thirty-six (36) were filed by owners of the mineral interests which are the subject of the Leases.   Each claim includes a reservation of rights as to whether prior lease saving operations were commenced within the time required under the Leases and/or whether such operations constitute "continuous drilling operations" as defined under the Leases.   Attached hereto as **Exhibits B** and **C** are copies of the two forms of reservation of rights.   The Trustee disputes any contention that prior operations were untimely, or did not constitute, continuous drilling operations a defined under the Leases and believes the working interest owners would prevail in litigation over these issues.   However, the mere existence of this reservation creates an effective "cloud on title" as to the Primrose estate's working interest in the Leases and may chill interest therein by the public at large.   Further, if litigation where required to resolve these issues, the estate will face additional delays that will compound the financing issues discussed above.   The Trustee, in her business, judgment believes it to be in the best interests of the estates and their creditors to mitigate these risks by an auction sale of the Assets with a Stalking Horse Bidder as set forth below.   The Stalking Horse Bidder is aware of the Lessors' reservation of rights.

        C.      **Risks of Litigation**:   The Trustee believes the Primrose and La Sara estates have reasonable chances of prevailing in the Adversary Proceeding.   However, success is by no means assured and trial of the Adversary Proceeding could result in the failure to recover the LSV1 Transfer (or the transfer to PRIMPET) and the encumbrance of the estate's 34.5% with significant debt. The proposed auction allows for the Primrose estate to liquidate its interest in the 34.5%, and recover value for the working interest involved the LSV1 Transfer by the sale of the avoidance claims associated therewith.   The Trustee, in her business judgment, believes the proposed auction sale is the most effective means by which to mitigate the risks of litigation.

      17.      The Trustee solicited bids from interested parties to act as a "Stalking Horse" bidder at any auction sale approved by this Court.   Of the two (2) bids received, the Trustee has accepted (subject to Court approval) the bid of Tennyson Energy Investment Group, LLC ("Tennyson") to act as a Stalking Horse Bidder.   The full terms and conditions of this agreement are set forth in the attached **Exhibit D** (the "APA").   By way of summary only, the agreement provides that Tennyson will pay the estate $950,000.00 ("Stalking Horse Bid") for the Assets and that it will act as Stalking Horse Bidder at the proposed auction. If the Stalking Horse Bid is not the Successful Bid at the auction, the estate proposes to pay Tennyson a

"breakup fee" of $60,000.00.  The negotiations between the Trustee and the Tennyson were conducted over a period of time, at arms-length and in good faith.   Tennyson's bid was subject to a competing bid by LSV1.

18.     The Trustee requests authorization to sell the Assets, collectively not separately, to the highest and best bidder at public auction to be held on **November 29, 2016 at 10:00 a.m. (CST)** at her offices located at 7700 San Felipe, Suite 550, Houston, Texas 77063.

19.     The Trustee requests that the auction be conducted according to the Bid Procedures attached as **Exhibit E**.   Additionally, the Trustee requests approval of the agreement with Tennyson to act as a Stalking Horse Bidder and for payment of the "breakup fee" of $60,000.00 in the event that Tennyson is not the Successful Bidder at auction.   Finally, the Trustee requests that she be authorized to close the sale of the Assets to the Successful Bidder without further Order of this Court.

20.     The Assets to be sold will be sold in an AS IS WHERE IS condition with all faults and defects, with no representations or warranties, express or implied, of any kind.

21.     Save and except with regard to interests that run with the land the Trustee requests that the Assets be sold free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. §§ 363 (b) and (f), with any such claims attaching to the proceeds of sale.   Further, except with respect to (i) the effectiveness of the Sale of the Assets that are sold by and through the Order approving the relief sought herein and the APA and (ii) the effectiveness of the transfer of all other rights and interests of Seller by and through the Order and the APA, neither the factual recitations in the Motion nor any findings in the Order shall have preclusive effect as to any fact, claim, issue, right, or remedy in the Adversary Proceeding, the MK/Blake Adversary or any other litigation.

22.     The Trustee also requests that the stay provided for under Federal Rule of Bankruptcy Procedure 6004(h) be waived as time is of the essence due to the pending December 2016 drilling deadline.

23.     The Trustee further requests that: (a) the Successful Bidder (or Backup Successful Bidder) at auction be found to have acted in good faith with regard to all aspects of the sale of the Assets; (b) that

neither it nor the Trustee have engaged in any conduct that would cause or permit the application of 11 U.S.C. § 363(n) to the sale; (c) that the buyer qualifies as a good faith purchaser in accordance with 11 U.S.C. § 363(m), and is entitled to all of the protections afforded thereunder; and (d) absent a stay pending appeal, the Buyer will be acting in good faith within the meaning of § 363(m) in closing the sale transaction.

### D. Request for Order for Inspection Procedures

24.     Parties interested in participating in the auction process will wish to conduct due diligence as to the Assets being sold.   To this end, the Trustee has agreed with MK Operating, subject to Court approval, to the following "Inspection Procedures":

1.     The estate will establish a virtual data room with the cooperation of MK Operating. The Trustee shall provide MK Operating with a written list of data required by the Trustee for the data room   MK shall provide the requested data within a set period of time of when the Trustee's list was received on October 31, 2016, except:

   a.     If certain requested data is not in MK Operating's possession, MK Operating will advise Trustee of this fact within one (1) business day of receipt of the Trustee's list;

   b.     If certain data requested by Trustee is not maintained in the ordinary course of business and would require MK to generate a new document, MK Operating shall not be required to do so and will advise Trustee of this fact within one (1) business day of receipt of the Trustee's list; and

   c.     If certain data requested by Trustee is already in the possession or control of Trustee, MK Operating shall advise Trustee of this fact within two (2) business day of receipt of the Trustee's list.

2.     Potential bidders must execute a confidentiality agreement prior to any access to the data room in the form attached to the Bid Procedures.

3.     The La Sara Field will be made available for a physical inspection by prospective bidders on two (2) dates within the 2-week period following approval of the auction procedures as ordered by the Court.   Potential bidders must, in addition to executing the confidentiality agreement referenced above, also execute a Release and Waiver in the form attached to the Bid Procedures.

4.     The estate shall reimburse MK Operating for all out of pocket expenses incurred as a result of affording potential bidders the opportunity to tour the La Sara Field.   The out of pocket costs, not to exceed $250 per day, shall be for mileage costs at $0.54 per mile and lodging costs.   MK Operating shall submit an invoice to the Trustee for all out of pocket expenses within ten (10) business days of completion of the auction, whereafter the estate shall pay all recompensable sums within thirty (30) days.

19.     The Trustee requests entry of an Order providing for the foregoing Inspection Procedures in connection with the proposed auction.

### E. Motion to Extend Deadline to Assume or Reject Executory Contracts and for Authority To, Assume and Assign Executory Contracts in Connection with Sale

20.     On July 20, 2016, the Court entered an Order extending the Trustee's deadline to assume or reject certain executory contracts to November 29, 2016.   Good cause exists to extend this deadline to December 7, 2016, so as to allow the Trustee to conduct the auction contemplated herein, close the transactions and assume and assign the relevant executory contracts.

21.     Further, 11 U.S.C. § 365(b)(1) provides –

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

22.     11 U.S.C. § 365(f)(2) provides that a trustee may assign an executory contract if -

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

23.     The Trustee requests authorization to assume and assign the JOA, and all related executory contracts, in conjunction with the contemplated auction and closing thereof.   The funds to be received from the auction sale, as provided for in the Stalking Horse Bid, or such superior Successful Bid, provide adequate assurance of cure/compensation under 11 U.S.C. § 365(b)(1).  The Stalking Horse Bidder, or other Successful Bidder, will provide adequate assurance of future performance under the executory contracts to be assumed and assigned.

24.     The Trustee posits that expedited consideration of the relief sought herein so as to allow the closing of the contemplated sale sufficiently far in advance of the December 2016 drilling deadline which, in turn, will allow any buyer to fulfill its obligations under the assumed and assigned JOA.

25.     *The Trustee advises that the proposed order accompanying this motion may be amended prior to or at the hearing on the relief sought herein.*

### E. Consent with Respect to Rights of Landowners/Mineral Lessors.

26.     *<u>If Tennyson is the successful bidder and closes the sale pursuant to this Motion and the Order, then all landowners and/or mineral lessors who receive notice of this Motion shall be deemed to consent to the transfer and assignment of the Assets to Tennyson in all respects as might be applicable under the Leases and as pertains to any consent required under the Leases.</u>*

WHEREFORE, Applicant prays that this Court grant the relief sought herein and for such other and further relief as is just and equitable.

Respectfully submitted,

*/s/ Marc Douglas Myers*
_____
Marc Douglas Myers
Ross, Banks, May, Cron & Cavin, P.C.
SBN 00797133
7700 San Felipe, Suite 550
Houston, Texas 77063
(713) 626-1200; (713) 623-6014 fax
mmyers@rossbanks.com
COUNSEL FOR THE TRUSTEE

### CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2016, a true and correct copy of the foregoing was sent via regular US mail to the Debtor, counsel for the Debtor, the Trustee, counsel for the Trustee, the US Trustee, all creditors and all persons requesting notice as set forth below unless otherwise served by the CM-ECF system.   A supplemental certificate of service will be filed as to the landowners and/or mineral lessors who received a copy of this Motion.

*/s/ Marc Douglas Myers*
_____
Marc Douglas Myers

Adelaide Hebert, MD
401 West Spreading Oaks
Friendswood, Tx 77546-4446

Amex/American Express
P.O. Box 3001
16 General Warren Blvd
Malvern, PA 19355-1245

Atlas Advisors
c/o Evan Grappleberg
21 Fox Hollow Drive
East Quoque, NY 11942-3618

Bank of America
P.O. Box 982238
El Paso TX 79998-2238

Capital One, N.a.
Capital One Bank (USA) N.A.
P.O. Box 30285
Salt Lake City, UT 84130-0285

Chase
P.O. Box 15298
Wilmington, DE 19850-5298

Chase-pier1
Chase Card Svcs/Attn:Bankruptcy
Dept
P.O. Box 15298
Wilmington, DE 19850-5298

Citibank
P.O. Box 790034
St Louis MO 63179-0034

Clay Investments
5427 Santa Chase Lane
Sugar Land, TX 77479

Clear Creek ISD
P.O. Box 201930
Houston, TX 77216-1930

D.Z. Kaufman, J.D. Ph.D.
Kaufman Law Group, PLLC
8000 Towers Crescent Drive, Suite
1350
Vienna, VA 22182-6207

Everhome Mortgage Co/Ever Bank
Attn: Bankruptcy Department
301 West Bay Street
Jacksonville, FL 32202-5184

Feb/frys
280 W 10200 S Ste 200
Sandy, UT 84070-4380

First Community Cred U
15260 FM 529
Houston, TX 77095-3252

GECRB/Home Design
Attn: bankruptcy
P.O. Box 103104
Roswell, GA 30076-9104

GECRB/Jewelry Accents
Attention: Bankruptcy
P.O. Box 103104
Roswell, GA 30076-9104

GECRB/Sams Club
GECRB/Sams Club
P.O. Box 103104
Roswell, GA 30076-9104

HCA
P.O. Box 403375
Atlanta, GA 30384-3375

Harris County MUD #55
P.O. Box 73109
Houston, TX   77273-3109

Hudgins Law Firm
515 King Street Suite 400
Alexandria VA 22314-3149

Hudgins Law Firm
515 King Street, Ste 400
Richmond, VA 22314-3149

Ian Reynolds MD P.A.
450 Medical Center Blvd Suite 206
Webster, TX   77598-4229

Kay M Gumbinner Trust
Robert Gumbinner Trustee
c/o Kaufman Law Group PLLC
8000 Towers Cresent Drive Suite
1350
Vienna, VA 22182-6207

Klinette H. Kindred, Chapter 7
Trustee
c/o Kutak Rock LLP
1101 Connecticut Ave, N.W.
Suite 100
Washington DC   20036-4374

LA Fitness
2600 Michelson Drive #300
Irvine, California, 92612-6536
Houston, Texas

Mary Hartman (Holderith)
16127 Copper Canyon
Friendswood, TX 77546-8105

Matt Duffy
247 Commercial Drive
Yorkville, IL 60560-4579

Memorial City Bank
Two Memorial City Plaza
820 Gessner #140
Houston, TX 77024-4489

Option One Mortgage Co/American
Home Mor
AHMSI, Inc
P.O.Box   631730
Irving, TX 75063-0002

Orthoequipe Ltd
450 Medical Center Blvd Suit 206
Webster, Texas 77598-4229

Parker Strauss and Tom Usery
2485 E Southlake Blvd Ste 160
Southlake, Texas 76092-6687

Paul Looney
13415 Fosca Lane
Houston, Texas   77079

Project/gemb
P.O. Box 103104
Roswell, GA 30076-9104

Prosperity Bank
100 West Medical Center Blvd
Webster, TX 77598-4212

Prosperity Bank
101 South Main St.
Victoria, TX 77901-8154

Prosperity Bank
104 W. Crockett St.
Cleveland, Texas 77327-3939

Prosperity Bank
3515 W Camp Wisdom Rd
Dallas, TX 75237-2505

Reliant Bank
1736 Carothers Pkwy, Suite 100
Brentwood, TN 37027-8167

Sears/cbna
P.O. Box 6189
Sioux Falls, SD 57117-6189

SunTrust Bank
901 Semmes Ave
Richond, VA 23224-2243

Syncb/ashley Homestore
C/o P.o. Box 965036
Orlando, FL 32896-0001

US Trustee
Attn: Nancy Holley
515 Rusk Ave, Ste 3516
Houston, TX 77002-2604

Ventra Consulting Ltd
1 Ashboune House
10 Lawrie Park Gardens
London, SD26 6HL

Wells Fargo
1 Home Campus X2303-01A
Des Moines, IA 50326

Wells Fargo
P.O. Box 60510
Los Angeles, CA 90060-0510

Whiteford, Taylor & Preston, LLP
3190 Fairview Park Drive, Suite 300
Falls Church, VA 22042-4559
Attn:   Justin Fasano

YG Funding Group LLC
2720 Crest Ridge Road
Hopkins, MN   55305-2807

Ian J Reynolds
2905 Birch Baugh
Pearland, TX 77581-5917

Reese Baker
Patrick Joseph Gilpin Jr
5151 Katy Freeway, Suite 200
Houston, Tx 77007-2261

Bayou-Medical Investments
c/o Mr. Jeffrey E. Sher
2727 Allen Parkway, Suite 900

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE** | § | |
| | § | **CASE NO. 16-30822** |
| **PRIMROSE LA SARA, LLC** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR** | § | **CHIEF JUDGE DAVID R. JONES** |

| | | |
|---|---|---|
| **EVA S. ENGELHART, TRUSTEE OF THE** | § | |
| **CHAPTER 7 ESTATE OF PRIMROSE LA** | § | |
| **SARA, LLC; and EVA. S. ENGELHART,** | § | |
| **TRUSTEE OF THE CHAPTER 7 ESTATE** | § | |
| **OF LA SARA OPERATING COMPANY,** | § | |
| **LLC.** | § | **ADV. NO. 16-03187** |
| | § | |
| **vs.** | § | |
| | § | |
| **LASARA VENTURES 1, LLC; PRIMROSE** | § | |
| **PETROLEUM, LLC; MK OPERATING** | § | |
| **COMPANY, LLC, HUISACHE E & P** | § | |
| **COMPANY, LLC and MILES** | § | |
| **REDFIELD KLEPPER** | § | |

**<u>FIRST AMENDED ORIGINAL COMPLAINT</u>**

**To The Honorable David R. Jones,
Chief United States Bankruptcy Judge:**

COMES NOW Plaintiffs Eva S. Engelhart, Chapter 7 Trustee of the Estate of La Sara Operating Co., LLC and Eva S. Engelhart, Chapter 7 Trustee of the Estate of Primrose La Sara, LLC and files this Original Complaint and would show as follows:

**<u>A.  Parties</u>**

1.      Eva S. Engelhart, Chapter 7 Trustee of the Estate of La Sara Operating Co., LLC (the "La Sara Trustee"), is the duly appointed Chapter 7 Trustee in Case No. 16-30453, *In re La Sara Operating Company, LLC*, pending before this Honorable Court.  The Trustee may be served through the undersigned counsel.

2.      Eva S. Engelhart, Chapter 7 Trustee of the Estate of Primrose La Sara, LLC (the "Primrose

Trustee"),[1] is the duly appointed Chapter 7 Trustee in Case No. 16-30822, pending before this Honorable

Court.    The Trustee may be served through the undersigned counsel.

3.      LaSara Ventures 1, LLC, is a Texas Limited Liability Company and may be served with

summons and complaint at the following address:

> LaSara Ventures 1, LLC
> c/o Ray Johnson
> 13 Suffolk Dr.
> Midland, Texas 79705

4.      Primrose Petroleum, LLC, is a Texas Limited Liability Company and may be served with

summons and complaint at the following address:

> Primrose Petroleum, LLC
> c/o Miles Redfield Klepper, Registered Agent
> 2728 McKinnon #2014
> Dallas, Texas 75201

5.      MK Operating Company, LLC , is a Texas Limited Liability Company and may be served

with summons and complaint at the following address:

> MK Operating Company, LLC
> c/o Miles Redfield Klepper, Registered Agent
> 2728 McKinnon #2014
> Dallas, Texas 75201

6.      Huisache E & P Company, LLC, is a Texas Limited Liability Company and may be served

with summons and complaint at the following address:

> Huisache E & P Company, LLC
> c/o Petro Energy Group, Registered Agent
> 11623 Spring Cypress Unit C
> Tomball, Texas 77377

7.      Miles Redfield Klepper, is an individual residing in the State of Texas and may be served
with summons and complaint at the following address:

> Miles Redfield Klepper
> 2728 McKinnon St., Apt. 2014
> Dallas, Texas 75201-1650

**B. Jurisdiction and Venue**

---

[1] Eva S. Englehart may also be generally referred to as "Trustee".

8.      This adversary proceeding arises in and relates to the above-styled Chapter 7 bankruptcy case and the Chapter 7 bankruptcy case of Primrose Lara LLC.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.  This proceeding involves claims arising under Chapter 5 of the United States Bankruptcy Code, such claims are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H), (K) and/or (O).  This proceeding also involves claims arising under state law which, to the extent that such claims are non-core proceedings, the Court may hear pursuant to 28 U.S.C. § 157(c)(1).  Venue is appropriate in this District pursuant to 28 U.S.C. § 1409.  The Trustee consents to the entry of a final judgment by this Court if Defendants make an appearance.  If Defendants fail to appear, the Trustee respectfully requests the Court issue proposed findings of fact and conclusions of law to the District Court for entry of a final default judgment.

## C.  Factual Background

9.      On January 28, 2016, La Sara Operating Company, LLC ("La Sara") filed for voluntary Chapter 7 bankruptcy protection.  On the same date, the Trustee was appointed interim Trustee and later became permanent Trustee.  As detailed more thoroughly below, La Sara was formerly known as Risco La Sara Operations, LLC.

10.     On February 17, 2016, Primrose La Sara, LLC ("Primrose") filed for voluntary Chapter 11 bankruptcy protection and proceeded to operate as a Debtor-in-Possession until conversion of the case on June 1, 2016.  As detailed more thoroughly below, Primrose was formerly known as Risco La Sara, LLC.

11.     Pursuant to that certain Asset Purchase Agreement dated November 22, 2010 and that certain Conveyance, Assignment, and Bill of Sale effective December 31, 2010 (the "Blake Conveyance"), Risco La Sara, LLC ("Risco La Sara") acquired from BLAKEnergy, Ltd. ("Blake")[2] a 71.5% working interest in 2 mineral leases, commonly referred to as the "Crane Mallard Lease" and the "Roadrunner Lease" (hereinafter referred to as the "Yturria Leases" or the "Willacy Field") which, at the time,

---

[2]      Blake is owned and controlled by Mr. David Blake (hereinafter also referred to as "**Blake**").

encompassed approximately 3,772.7 acres[3] in Willacy County, Texas, together with associated property, fixtures, improvements, equipment, well files and contract rights, including a license agreement for seismic data. The Blake Conveyance was recorded in the Willacy County, Texas, Real Property Records on January 21, 2011. The two leases comprising the Willacy Field are more commonly referred to as "Crane Mallard" and "RoadRunner". The Crane Mallard lease was originally dated December 1, 2001, and was between Fausto Yturria Jr., *et al.* and Swift Energy. Crane Mallard covers 2,975.8 acres in Willacy County, Texas. The RoadRunner lease was originally dated April 11, 2005, and was between Fausto Yturria Jr., *et al.* and Blake and initially covered 796.9 acres and is immediately adjacent to the acreage involved with the Crane Mallard lease. Thereafter, RoadRunner was amended effective as of March 1, 2011 to, among other things, expand its total acreage from approximately 769.9 to approximately 2,975.8 acres.

12.     The remaining 28.5% working interest in the Willacy Field was owned 15% by Blake and 13.5% by Amerril Energy, LLC ("Amerril"). Pursuant to that certain Cross Assignment and Bill of Sale (the "Amerill Assignment") Amerril transferred its working interest in the Willacy Field to Primrose Petroleum, LLC ("PRIMPET"). PRIMPET was formed on January 27, 2014, and is owned/controlled by Mr. Klepper and/or Klepper *et al.* (as defined below). The Amerril Assignment appears to have been signed on April 2, 2014, and was filed in the Willacy County, Texas Real Property Records on April 15, 2014.

13.     Up until January 7, 2016, La Sara was the designated contract operator of the Willacy Field. A Model Form Operating Agreement dated January 5, 2011 (the "JOA"), governs the rights and obligations of the working interest owners and the operator of the Willacy Field. A Memorandum of Operating Agreement and Financing Statement of the JOA was filed in the Willacy County Real Property Records on January 21, 2011 (the "Memorandum of JOA").

14.     Pursuant to that certain Membership Interests Purchase Agreement dated January 29, 2014, between PRIMPET and Risco Energy USA, Inc., PRIMPET acquired a majority of the membership interests in Risco La Sara, LLC. On February 10, 2014, Risco La Sara, LLC changed its name to Primrose

---

[3]     As described below, the Willacy Field acreage was subsequently expanded to approximately 6,000 acres.

La Sara, LLC.  On February 13, 2014, Risco La Sara Operations, LLC changed its name to La Sara Operating Company, LLC.

15.     The Amerril Assignment recites that Amerril owed La Sara $351,279.33[4] for unpaid joint interest billings, and that PRIMPET was assuming payment of this obligation (the "PRIMPET Transfer"). However, PRIMPET never paid any portion of this obligation; rather, Mr. Klepper and/or other control parties of the Defendants (collectively "Klepper *et al.*") caused La Sara to write off this entire obligation as "bad debt" and took no action to collect the debt.  Given that this was part of the consideration paid for the Amerril Assignment, this amounts to a failure to pay part of the consideration.

16.     Throughout 2015, Primrose/La Sara continued to operate the Willacy Field and sent joint interest billings statements ("JIBs") On June 26, 2014, La Sara Ventures 1, LLC ("LSV 1") was formed by Mr. Klepper.  The membership of LSV 1 is composed of investors primarily from Midland, Texas, with whom Mr. Klepper had an existing relationship.  At all times relevant, Mr. Klepper has had a position of responsibility, authority and/or influence with regard to LSV 1, whether as an employee, manager and/or representative thereof while also having substantive personal, financial and/or business relationships with the members of LSV 1.  Further, at all time relevant, Mr. Klepper has had a position of responsibility, authority and influence with regard to both Primrose and La Sara, whether as employee, manager, officer, director, and/or representative thereof, as well as having the same or similar relationships/capacities with the members of both entities.  LSV 1 and its control parties are hereafter included in the term "Klepper *et al.*"

17.     On October 29, 2015, an Assignment and Bill of Sale was recorded in the Willacy County, Texas, Real Property Records, whereby Primrose conveyed a 37% of the 8/8ths undivided interests in and to the Crane Mallard and RoadRunner leases to LSV 1 (hereafter the "LSV 1 Transfer").  Mr. Klepper was a control party/representative on both sides of this transaction and all transactions leading up thereto.

18.     There is no written contract, or other form of written agreement, between Primrose and

---

[4] La Sara's books and records indicate that this debt was actually $354,778.02.

LSV 1 for the LSV 1 Transfer. There is no written agreement between Primrose and LSV 1 wherein LSV 1 agreed to answer for the debts of Primrose. Although Defendants allege LSV 1 paid for the LSV 1 Transfer, Primrose's accounting/bank records suggest that most money paid to it in 2014 came from Primrose Resources, LLC ("PRIMRES"), not LSV 1, but was credited to LSV 1's joint interest billing account. So you have advances without any written agreement between Primrose with either LSV 1 or PRIMRES that supposedly later form the consideration for the October 2015 transfer of the working interest, long after the advances were made.

19.     At the time of the LSV 1 Transfer, Primrose was indebted to La Sara in the amount of at least $2,172,936.39 for unpaid JIBs.

20.     On December 28, 2015, Huisache E & P Company, LLC ("Huisache")[5], another entity owned/controlled by Mr. Klepper and/or Klepper *et al.*, was approved by the Texas Railroad Commission to act as an operator of and oil and gas well(s), and is currently the designated operator for a number of oil and/or gas wells in Guadalupe, Hidalgo and Willacy Counties.   Based on information and belief, Klepper *et al.* have purchased a mineral lease on land contiguous to the Willacy Field. Using seismic information, geologic analysis and data created by Primrose and La Sara, Huisache drilled two wells on the adjacent land in late 2015 and early 2016. Huisache utilizes the services of the same staff, including Julian Ayala, Land Manager, who also acts as MK Operating's Land Manager, and formerly served as Primrose's Land Manager.

21.     On December 1, 2015, Mr. Klepper formed MK Operating Company, LLC ("MK Operating"). On December 28, 2015, MK Operating was approved as an oil and gas well operator by the Texas Railroad Commission.   On January 7, 2016, Mr. Klepper sent notice to the working interest owners of the Willacy Field that La Sara had resigned as operator and that LSV 1 had nominated MK Operating to replace it as operator.  La Sara filed for Chapter 7 bankruptcy protection on January 28, 2016.

22.     On May 11, 2016, while the Primrose case was still under Chapter 11 of the Bankruptcy

---

[5] Huisache was originally formed on March 11, 2010, as Timberwolf E & P, LLC ("Timberwolf").  It was not until November 6, 2015, that Timberwolf changed its name to Huisache E & P Company, LLC.

Code, Klepper *et al.*, caused Primrose to file a motion to sell its working interest in the leases to Humid Oil Company, LLC ("Humid Oil") for $500,000 [Docket Number 36] (the "Sale Motion").  The proposed sale was conditioned on the avoidance of Blake's production and nets profits interests.  However, the Sale Motion failed to disclose it was an insider sale in that Humid Oil has common ownership with LSV 1.  The Trustee was recently advised that Humid Oil, or its owners, has since acquired ownership of PRIMPET. Hereafter, Humid Oil, and its control parties, are hereafter included in the term "Klepper *et al.*"

23.     On June 2, 2016, the Sale Motion was mooted by entry of an Agreed Amended Order Granting Motion to Convert [Docket Number 57, Case No. 16-30822].  The Conversion Order provided, in part, that the Primrose was to turn over all books and records to the Trustee within 5-days.  Although Primrose/La Sara turned over the data files for software utilized by the Debtor to manage O&G operations at the Willacy Field, Primrose's 2014 tax return, and what purports to be an electronic copy of its general ledger, the Trustee did not receive tax returns beyond 2014; contracts or other documents related to the LSV 1 Transfer (which the Trustee now believes simply does not exist), contract or documents related to any other transaction entered into by Primrose of any kind;  correspondence or communications of any kind; resolutions or minutes of any kind; corporate governance/ownership related documents; or other documents commonly associated with the financial activity, governance or ownership of a business.

24.     Based upon publicly available production data, it appears that from January 1, 2016 through the end of April 2016, approximately 8,516 barrels of oil were produced from the Crane Mallard and RoadRunner leases.  Assuming that all production was sold at $40 per barrel, approximately $340,000 in gross revenue was generated through April 2016.  Although the Primrose Estate holds a 34% working interest in this production, the Primrose Trustee has not been provided any evidence of payment of funds to the Debtor nor an accounting of how any of the gross proceeds of sale were disposed of by MK Operating. However, it does appears that at least some of the funds generated by the sale of production were being paid directly to Mr. Klepper as, per his own testimony, MK Operating was paying him a salary of

$10,000/month, plus the  salaries of former officers or employees of Primrose and/or La Sara.[6]

### D. Causes of Action

**Count I – The LSV 1 Transfer is Recoverable under 11 U.S.C. §§ 548, 550**

25.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count I.

26.     The LSV 1 Transfer was a transfer of an interest of Primrose in property made on or within two (2) years before the date of the filing of the petition made with the actual intent to hinder, delay and/or defraud existing creditors of the Primrose.

27.     Alternatively and/or in addition thereto, the LSV 1 Transfer, was a transfer of an interest of Primrose in property made on or within two (2) years before the date of the filing of the petition, whereby less than reasonably equivalent value was received in exchange for such transfer; and Primrose was insolvent on the date of the transfer or became insolvent as a result of the transfer.

28.     Alternatively and/or in addition thereto, the LSV 1 Transfer was a transfer of an interest of Primrose in property made on or within two (2) years before the date of the filing of the petition, whereby less than reasonably equivalent value was received in exchange for such transfer; and Primrose was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

29.     Alternatively and/or in addition thereto, the LSV 1 Transfer, was a transfer of an interest of Primrose in property made on or within two (2) years before the date of the filing of the petition, whereby less than reasonably equivalent value was received in exchange for such transfer; and Primrose intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

30.     Section 550(a)(1) of the Code provides that:

---

[6] Klepper's payment of all salaries of employees and his own $10,000 per month salary vastly exceeds the amounts allowed for overhead under the JOA. The JOA Copas Accounting Procedures provide that the Operator shall be paid a "fixed rate" for overhead in the amount of $10,000 per month for the "drilling well rate" and $1,000 per month for the "producing well rate."

Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547, 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

a.      the initial transferee of such transfer or the entity for whose benefit such transfer was made; . . .

31.      LSV 1 was the initial transferee with regard to the LSV 1 Transfer.  To the extent that LSV 1 is a subsequent transferee, it is not a good faith transferee.

32.      The Primrose Trustee is entitled to avoid and recover the LSV 1 Transfer under 11 U.S.C. §§ 548 and 550.

**Count II – The LSV 1 Transfer is Recoverable under 11 U.S.C. § 547, 550**

33.      The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count II.

34.      LSV 1 is an insider of the Primrose Estate.

35.      Within the 1-year period prior to the Petition Date, the LSV 1 Transfer was made to LSV 1.

36.      The LSV 1 Transfer was a transfer of an interest of the Debtor in property.

37.      The LSV 1 Transfer was made on account of an antecedent debt and/or obligation.

38.      The LSV 1 Transfer was made while the Debtor was insolvent.

39.      The LSV 1 Transfer enabled LSV 1 to receive more than it would had the transfer not been made and the interest liquidated in a Chapter 7 case.

**Count III – The LSV 1 Transfer is Recoverable under Texas Business and Commerce Code § 24.001 et seq.**

40.      The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count III.

41.      At the time of the LSV 1 Transfer, Primrose was subject to creditor claims beyond its ability repay on a timely basis.

42.      The LSV 1 Transfer was done with the actual intent to hinder, delay or defraud the creditors of the Primrose estate

43.     Alternatively and/or in addition thereto, The LSV 1 Transfer was done without the exchange of reasonably equivalent value while Primrose was engaged, or was about to engage, in business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

44.     Alternatively and/or in addition thereto, the LSV 1 Transfer was done without the exchange of reasonably equivalent value and Primrose intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

45.     Alternatively and/or in addition thereto, the LSV 1 Transfer was made without Primrose receiving reasonably equivalent value and while it was insolvent, or became insolvent as a result of the transfer or obligation.

46.     Alternatively and/or in addition thereto, the LSV 1 Transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

47.     The Primrose Trustee is entitled to avoid and recover the LSV 1 Transfer under Texas Business and Commerce Code § 24.008.

48.     Pursuant to Texas Business and Commerce Code § 24.013, the Primrose Trustee requests all reasonable attorney's fees and costs incurred in pursuit of these claims.

**Count IV – Foreclosure of Operator's Lien Against LSV 1 Working Interest**

49.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count IV.

50.     Pursuant to Section VII(B) of the JOA, the operator is granted a lien against all of a non-operator's oil and gas rights in the Willacy Field, and a security interest in its share of oil and gas when extracted and its interest in all equipment ("Operator Lien") to secure payment of the non-operator's share of operating expenses as follows:

B.   Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

51.     At the time of the LSV 1 Transfer, Primrose was indebted to La Sara in the amount of at least $2,165,971.73 for its share of operating expenses, with such debt being secured by lien against Primrose's working interest in the Willacy Field.  La Sara's Operator Lien was perfected by virtue of the filing of the Memorandum of JOA in the Real Property Records of Willacy County, Texas.  Accordingly, LSV 1 took the 37% working interest received by it, subject to the Operator Lien in favor of La Sara securing a debt in the amount of at least $2,165,971.73.  In the event the LSV 1 Transfer is not avoided, the La Sara Trustee requests in the alternative a judgment foreclosing its Operator Lien against LSV 1's working interest, production proceeds and equipment and ordering a foreclosure sale of such property to satisfy the debt.

**Count V –Foreclosure of Operator's Lien Against PRIMPET's Working Interest**

52.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count V.

53.     At the time of the PRIMPET Transfer, Amerill was indebted to La Sara in the amount of at least $351,279.33 for its share joint interest billings, with such debt being secured by the Operator Lien against Amerill's working interest in the Willacy Field, and any production proceeds and equipment,

PRIMPET assumed liability to pay the $351,279.33 as part of the consideration for the PRIMPET Transfer. Accordingly, PRIMPET took the 13.5% working interest received by it from Amerril, subject to a lien in favor of La Sara to secure its obligations to pay the $351,279.33 and any other amounts to become due under the terms of the JOA.  In the event, the Trustee reacquires title to the working interest through avoidance and/or foreclosure, the La Sara Trustee requests a judgment for $351,279.33, plus any other amounts owing to La Sara under the terms of the PRIMPET Transfer or the JOA and for the foreclosure of La Sara's Operator Lien covering PRIMPET's working interest, production proceeds and equipment to satisfy the debt.

### Count VI – Transfer of Property of the Estate Recoverable under 11 U.S.C. §§ 549, 550 and Request for Accounting

54.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count VI.

55.     Primrose holds a 34% working interest in the Willacy Field and is entitled to a share of the revenue associated with the sale of production of oil and gas.  Since the filing of Primrose's Chapter 11 petition, at least 8,500 barrels of oil and an unknown amount of natural gas has been produced from the Willacy Field and sold to one or more third parties.  MK Operating has been the operator of the Willacy Field since the Petition Date and has caused the sale of production and utilized the proceeds of sale without the oversight of, input from or accounting to working interest owners not otherwise aligned with it.  Post-petition/conversion production from the Willacy Field, and the proceeds of sale thereof, are property of the Estate, the disposition of which has not been authorized by this Court.  The Trustee requests a judgment against MK Operating for the value of property of the Estate transferred to it pursuant to 11 U.S.C. § 549(a).

56.     Section 550(a)(1) of the Code provides that:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547, 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> a.      the initial transferee of such transfer or the entity for whose benefit such transfer was made; . . .

57.     MK Operating was the initial transferee with regard to the transfer of oil and/or gas

production, or proceeds thereof, which was property of the Estate.  MK Operating is not a good faith transferee, whether it is an initial or subsequent transferee.

58.     The Trustee further requests that MK Operating be made to account for its use and disposition of all proceeds of sale of production of oil and gas from Willacy Field since becoming operator thereof.

### Count VII – Violation of the Automatic Stay

59.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count VII.

60.     MK Operating, LSV 1 and Mr. Klepper are actively engaged in a coordinated effort to suppress production of the Willacy Field, minimize the value of the Roadrunner and Crane Mallard leases and discourage the investment/purchase by anyone other than the Klepper, *et al.* parties.  Further, such parties have purposefully withheld records and documents of the Estate and other records related to the operator's post-petition activity with the intent to either secret and/or destroy such information to further suppress the value of the Estates' interest and to coerce a sale to the Klepper *et al.* parties.  Such actions amount to a knowing and intentional violation of the automatic stay provided for under 11 U.S.C. § 362. The Trustee requests both interim relief and a judgment for all actual damages, punitive damages and reasonable and necessary attorney's fees related to such violations.

### Count VIII – Breach of Duties of Loyalty and Care and Fiduciary Duty

61.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count VIII.

62.     At all times relevant Mr. Klepper has been an officer and/or director of both La Sara and Primrose.  As an officer and/or director, Mr. Klepper had fiduciary duties and obligations to the Debtors and, when insolvent, to their creditors, as well as duties of care and loyalty to La Sara and Primrose.  As demonstrated above, Mr. Klepper thoroughly and repeatedly violated, and continues to violate, these duties and acted in his own self-interest at the expense of La Sara, Primrose and their creditors, both pre- and post-petition. The La Sara Estate has been damaged by Mr. Klepper's breach his duties thereto in at least of the

amounts of La Sara's Operator Liens against LSV 1 and PRIMPET.  The Primrose Estate has been damaged by Mr. Klepper's breach of his duties thereto in at least of the amounts of the value of the LSV 1 Transfer, post-petition transfers of estate property and violations of the automatic stay.

### Count IX – Turnover of Books and Records

63.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count IX.

64.     On June 2, 2016, an Agreed Amended Order Granting Motion to Convert was entered at Docket Number 57 in Case No. 16-30822.  In addition to conversion, the control parties for Primrose were was required to turn over all books and records to the Trustee within 5-days.  Although the Trustee has received a copy of Primrose' 2014 tax return, and what purports to be an electronic copy of its general ledger, she has not received tax returns beyond 2014; accounting data beyond the foregoing; contracts or other documents related to the transaction with LSV 1 (or any other transaction); correspondence or communications of any kind; resolutions or minutes of any kind; corporate governance/ownership related documents; or other documents commonly associated with the financial activity, governance or ownership of a business.  The Trustee requests relief requiring that all books and records of the Primrose estate be safe guarded and maintained in full and intact until delivered to the Trustee.

### Count X – Conversion and Turnover of Production or Proceeds of Production of Huisache Wells

65.     The factual allegations set forth herein are re-alleged and incorporated herein for purposes of Count X.

66.     In late 2015 and then again in early to mid-2016, Huisache drilled an oil and gas well on land immediately adjacent to the Willacy Field.  Mr. Klepper admitted in the 341 meeting for the Primrose case that he had an ownership interest in Huisache, but refused to testify as to what extent.  These wells were drilled using seismic data owned/licensed by La Sara and/or Primrose.  Although publicly available production information does not indicate that either of these wells are currently producing, it is believed they are capable of doing so and would draw from and drain the reserves associated with the Willacy Field,

thereby trespassing on and converting property of the estate.  To the extent that these wells become

producing and do drain from the reserves of the Willacy Field, the Trustee requests a money judgment for

all damages.

WHEREFORE, premises considered, Plaintiffs, pray that this Honorable Court grant judgment as

follows:

a.     A judgment for the Primrose Estate recovering the working interest transferred to LaSara
       Ventures 1, LLC;
b.     A judgment authorizing the foreclosure of La Sara's Operator Lien against LaSara
       Ventures 1, LLC's working interest, production proceeds and equipment and ordering a
       foreclosure sale of such property to satisfy the debt;
c.     A judgment recovering authorizing the foreclosure of La Sara's Operator Lien against
       Primrose Petroleum's working interest, production proceeds and equipment and ordering
       a foreclosure sale of such property to satisfy the debt
d.     A judgment recovering all property of the estate transferred post-petition;
e.     A judgment for actual damages sustained as a result of Defendant's violation of the
       automatic stay;
f.     A judgment for punitive damages as a result of Defendant's violation of the automatic stay;
g.     A judgment against Miles Klepper for all monetary damages sustained by the La Sara and
       Primrose estates.
h.     All reasonable and necessary attorney's fees as allowed by law;
i.     Pre- and post-judgment interest at the maximum rate allowed by law;
j.     Such other and further relief to which the Trustee may show herself entitled.

Respectfully submitted,

*/s/ Randy W. Williams*

_____
Randy W. Williams
Thompson & Knight, LLP
SBN 21566850
333 Clay St., Suite 3300
Houston, Texas 77002
(713) 653-8645; (832) 397-8181 fax
randy.williams@tklaw.com
SPECIAL COUNSEL FOR THE LA SARA
TRUSTEE AND PRIMROSE TRUSTEE

-and-

*/s/ Marc Douglas Myers*

_____
Marc Douglas Myers
Ross, Banks, May, Cron & Cavin, P.C.
SBN 00797133
7700 San Felipe, Suite 550
Houston, Texas 77063

(713) 626-1200; (713) 623-6014 fax
mmyers@rossbanks.com
GENERAL COUNSEL FOR THE LA SARA
TRUSTEE AND PRIMROSE TRUSTEE

**Fill in this information to identify the case:**

Debtor 1    PRIMROSE LA SARA, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Texas

Case number   16-30822 (DRJ)

Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Daniel Y. Butler, individually and as Trustee (see attached)
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Andrews Kurth LLP, c/o David A. Zdunkewicz
Name

600 Travis, Suite 4200
Number   Street

Houston    TX    77002
City    State    ZIP Code

Contact phone   713-220-4200

Contact email   dzdunkewicz@andrewskurth.com

Where should payments to the creditor be sent? (if different)

Daniel Y. Butler
Name

P.O. Box 1208
Number   Street

Brownsville    TX    78522
City    State    ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

**Part 2:**  Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

7. **How much is the claim?**   $ See Attached.   **Does this amount include interest or other charges?**
    ☑ No
    ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Claims related to oil and gas leases (see attached).

9. **Is all or part of the claim secured?**

☑ No
☐ Yes.  The claim is secured by a lien on property.

    **Nature of property:**
    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
    ☐ Motor vehicle
    ☐ Other. Describe: _____

    **Basis for perfection:** _____
    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:**     $_____
    **Amount of the claim that is secured:**     $_____
    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:** $_____

    **Annual Interest Rate** (when case was filed)_____%
    ☐ Fixed
    ☐ Variable

10. **Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.     $_____

11. **Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410                    Proof of Claim                    page 2

09/16/2016  09:32  9555424351  H. YTURRIA  PAGE  02/02

09-15-16  09:51am  From-  T-322  P.04/06  F-850

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this *proof of claim* must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  9-16-16
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

Name  Daniel Y. Butler
      First name       Middle name       Last name

Title  _____

Company  _____
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  P.O. Box 1208
         Number    Street
         Brownsville        TX    78522
         City               State  ZIP Code

Contact phone  _____    Email  _____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § § | Chapter 7 |
| PRIMROSE LA SARA, LLC, | | Case No. 16-30822 (DRJ) |
| Debtor. | | |

### ATTACHMENT TO PROOF OF CLAIM OF DANIEL Y. BUTLER

Daniel Y. Butler, individually; as Trustee of the Daniel Y. Butler Trust created under Trust Indenture dated July 10, 1974; as Co-Trustee of the Leonor Yturria Wood Testamentary Exempt Trust F/B/O Daniel Y. Butler; as Co-Trustee of the Leonor Yturria Wood Testamentary Non-Exempt Trust F/B/O Daniel Y. Butler; as Co-Trustee of the Leonor Yturria Wood Testamentary Exempt Trust F/B/O Richard E. Butler II; as Co-Trustee of the Leonor Yturria Wood Testamentary Non-Exempt Trust F/B/O Richard E. Butler II; and as Trustee of the Daniel Y. Butler Trust U/W/O Leslie O. Levi (collectively, the "Claimants") file this Proof of Claim. Claimants are the owners of an undivided interest in the mineral estate in lands covered by two Oil and Gas Leases covering lands in Willacy County, Texas. The Leases are described as follows:

Oil and Gas Lease dated April 11, 2005, from Fausto Yturria, Jr., et al., to BLAKEnergy, Ltd., as amended (the "Roadrunner Lease")

Oil and Gas Lease dated December 1, 2001, from Fausto Yturria, Jr., et al. to Swift Energy Company, as amended (the "Crane-Mallard Lease").

Interests in the leasehold estates granted by these Leases may be assets of the bankruptcy estate.

Each of the Leases covers a separate tract of land consisting of 2,975.8 acres. The two tracts are contiguous, and interests in the mineral estate in the lands are owned by the Claimants named herein, who receive the royalties on production from wells drilled on and producing from the Leases.

Each of the Leases provides that, after the end of the primary term, the Lease will terminate except for designated acreage around each well then producing on the leased premises. However, the Leases provide that they can be maintained in effect as to all of the leased premises beyond the primary term by "continuous drilling operations," as more particularly defined in the Leases.

3719331.2

Primrose has filed pleadings in this bankruptcy case asserting that both of the Leases remain in effect as to all of the lands covered thereby because "continuous drilling operations" have been conducted on each of the Leases as required by their terms. Claimants have not agreed, and are not required by the terms of the Leases to agree or acknowledge, that the Lessee's operations on the Leases are sufficient "continuous drilling operations" to maintain the Leases in effect. The calculations necessary to determine what constitutes continuous drilling operations are complex and require factual information concerning well drilling and completion operations that is not available to Claimants, including calculation of "banked time." The issues related to continuous drilling operations and banked time are discussed in an attachment, Exhibit B, to a pleading filed by MK Operating Company in this matter, styled "MK Operating Company, LLC's Objections to Trustee's Application to Employ General Counsel Nunc Pro Tunc and for Authority to Enter into Contingency Fee Agreement and Trustee's Motion for Authority to Allow Association of Counsel" (Dkt. 93). In that pleading, MK Operating asserts that "the next obligatory well must commence drilling operations no later than September 29, 2016, unless "banked days" are used to extend the deadline to October 3, 2016."

Claimants file this proof of claim out of an abundance of caution, to preserve their rights under the Leases and to assert any claims that they may in this bankruptcy case. Claimants do not have sufficient facts to determine whether the Leases have been maintained by continuous drilling operations. Substantial issues may exist whether prior operations claimed by Primrose to constitute continuous drilling operations were commenced within the time required by the Leases and whether such operations constitute "continuous drilling operations" as defined by the Leases. Claimants do not at this time contest Primrose's or MK Operating's allegations with respect to the status of the Leases, nor do Claimants concur with those allegations. Claimants reserve the right in the future, based on facts to be determined, to contend that either or both of the Leases have terminated (except as to producing wells) by cessation of continuous drilling operations.

Filing of this Claim is not (a) a waiver or release of Claimants' rights, claims or defenses against any person, entity or property; (b) a waiver or release of Claimants' right to have any and all final orders in any and all non-core matters entered only after de novo review by a United States District Judge; (c) consent by Claimants to jurisdiction of this Court for any purpose other than with respect to this Claim; (d) an election of remedy; (e) a waiver or release of any rights which Claimants may have to a jury trial; or (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or any other proceedings that may be commenced in this case against or otherwise involving Claimants including without limitation, any adversary proceeding that was or may be commenced by any party or committee in this case. Claimants reserve their rights to amend or supplement their claims against the Debtor for any reason or cause of action whatsoever.

2

**Fill in this information to identify the case:**

Debtor 1    Primrose La Sara, LLC f/k/a Risco La Sara, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Texas

Case number    16-30822

## Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Martin E. Garcia

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Christopher H. Trickey
Name

401 Congress Ave., Suite 2200
Number      Street

Austin                    TX          78701
City                      State       ZIP Code

Contact phone  512.480.5620

Contact email  ctrickey@gdhm.com

**Where should payments to the creditor be sent?** (if different)

Name

Number      Street

City                      State       ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

**Part 2:**     **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**
☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:   ____  ____  ____  ____

7. **How much is the claim?**
UNKNOWN AT THIS TIME
$_____. **Does this amount include interest or other charges?**
☐ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Exhibit "A" (attached hereto)

9. **Is all or part of the claim secured?**
☑ No
☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                           $_____
**Amount of the claim that is secured:**      $_____
**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**      $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**
☐ No
☑ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____ 0.00

11. **Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  _____
　　　　　　　　　　MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | John B. McFarland |
| | First name          Middle name          Last name |
| Title | Attorney |
| Company | Graves Dougherty Hearon & Moody, P.C. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 401 Congress Ave., Suite 2200 |
| | Number          Street |
| | Austin                                          TX          78701 |
| | City                                             State       ZIP Code |
| Contact phone | 512.480.5618          Email jmcfarland@gdhm.com |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| PRIMROSE LA SARA, LLC, | § | Case No. 16-30822 (DRJ) |
| | § | |
| Debtor. | § | |
| | § | |

## EXHIBIT A

Claimants[1] are the owners of the mineral interest in lands covered by two Oil and Gas Leases covering lands in Willacy County, Texas. The Leases are described as follows:

Oil and Gas Lease dated April 11, 2005, from Fausto Yturria, Jr., et al., to BLAKEnergy, Ltd., as amended (the "Roadrunner Lease")

Oil and Gas Lease dated December 1, 2001, from Fausto Yturria, Jr., et al. to Swift Energy Company, as amended (the "Crane-Mallard Lease").

Interests in the leasehold estates granted by these Leases may be assets of the bankruptcy estate.

Each of the Leases covers a separate tract of land consisting of 2,975.8 acres. The two tracts are contiguous, and the mineral ownership in the lands is owned by the Claimants named herein, who receive the royalties on production from wells drilled on and producing from the Leases.

Each of the Leases provides that, after the end of the primary term, the Lease will terminate except for designated acreage around each well then producing on the leased premises. However, the Leases provide that they can be maintained in effect as to all of the leased premises beyond the primary term by "continuous drilling operations," as more particularly defined in the Leases.

Primrose has filed pleadings in this bankruptcy case asserting that both of the Leases remain in effect as to all of the lands covered thereby because "continuous drilling operations" have been conducted on each of the Leases as required by their terms. Claimants have not agreed, and are not required by the terms of the Leases to agree or acknowledge, that the Lessee's

---

[1] Claimants, including the claimant to whose proof of claim this Exhibit is attached, are listed below.

operations on the Leases are sufficient "continuous drilling operations" to maintain the Leases in effect. The calculations necessary to determine what constitutes continuous drilling operations are complex and require factual information concerning well drilling and completion operations that are not available to Claimants, including calculation of "banked time." The issues related to continuous drilling operations and banked time are discussed in an attachment, Exhibit B, to a pleading filed by MK Operating Company in this matter, styled "MK Operating Company, LLC's Objections to Trustee's Application to Employ General Counsel Nunc Pro Tunc and for Authority to Enter into Contingency Fee Agreement and Trustee's Motion for Authority to Allow Association of Counsel" [Dkt. 93]. In that pleading, MK Operating asserts that "the next obligatory well must commence drilling operations no later than September 29, 2016, unless "banked days" are used to extend the deadline to October 3, 2016."

Claimants file their proofs of claim out of an abundance of caution, to preserve their rights under the Leases. Claimants do not have sufficient facts to determine whether the Leases have been maintained by continuous drilling operations. Substantial issues may exist whether prior operations claimed by Primrose to constitute continuous drilling operations were commenced within the time required by the Leases and whether such operations constitute "continuous drilling operations" as defined by the Leases. Claimants do not at this time contest Primrose's or MK Operating's allegations with respect to the status of the Leases, nor do Claimants concur with those allegations. Claimants reserve the right in the future, based on facts to be determined, to contend that either or both of the Leases have terminated (except as to producing wells) by cessation of continuous drilling operations.

Filing of this Claim is not (a) a waiver or release of Claimants' rights, claims or defenses against any person, entity or property; (b) a waiver or release of Claimants' right to have any and all final orders in any and all non-core matters entered only after de novo review by a United States District Judge; (c) consent by Claimants to jurisdiction of this Court for any purpose other than with respect to this Claim; (d) an election of remedy; (e) a waiver or release of any rights which Claimants may have to a jury trial; or (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or any other proceedings which may be commenced in this case against or otherwise involving Claimants including without limitation, any adversary proceeding that was or may be commenced by any party or committee in this case. Claimants reserve their rights to amend or supplement their claims against the Debtor for any reason or cause of action whatsoever.

**List of Claimants:**

Dorothy Elizabeth Hablinski; Mary Eleanor Yturria Wilkerson; The Lillie M. Tijerina Family Limited Partnership; VSR Royalties, Ltd.; Zarate Family, Ltd.; Garmon Enterprises III, Ltd.; JS Family Investment Partnership, Ltd.; John Anthony Garcia Family Partnership, Ltd.; Mary B. Mallet Royalties Partnership, Ltd.; MGB Royalty Partnership, Ltd.; The Isabel Garcia Family Limited Partnership; M.A. Garcia Family Limited Partnership; Schulz Family Royalties Partnership, Ltd.; William J. Thomas; Mike Neal; Maria Lee Semelsberger; Betka Mineral Partners, Ltd.; and A-3 Minerals, L.P.

## ASSET PURCHASE AGREEMENT

1.     **PARTIES**:   Subject to the terms stated herein, Seller agrees to sell and assign, transfer, set over and/or convey to Buyer the Property described in Paragraph 2.   Buyer agrees to buy the Property from Seller for the sales price stated in Paragraph 3.   The parties to this contract are:

Seller:   Eva S. Engelhart, Trustee of the Chapter 7 Estates of Primrose La Sara, LLC, Case No. 16-30822 (the "Primrose Estate" or "Primrose Case") and La Sara Operating Company, LLC, Case No. 16-30453 (the "La Sara Estate" or "La Sara Case") (the Primrose Estate and the La Sara Estate together are referred to hereinafter as the "Bankruptcy Estates"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division and not in her individual capacity ("Seller").

Address:   7700 San Felipe, Suite 550, Houston, Texas 77063
Phone:      (713) 626-1200       Fax:      (713) 623-6014
email:       eengelhart@rossbanks.com

Buyer:   Tennyson Energy Investment Group, LLC ("Buyer" or "Stalking Horse Bidder")

Address:

TENNYSON ENERGY INVESTMENT GROUP, LLC
c/o Jeff Carruth
WEYCER KAPLAN, PULASKI & ZUBER PC
3030 Matlock Rd. Suite 201
Arlington   TX   76015
Phone:   (713) 341-1158       Fax:      (866) 666-5322
Email:   jcarruth@wkpz.com

2.     **PROPERTY**:   All right, title and interest of Seller in and to the following identified property (hereafter the "Property") free and clear of liens and claims pursuant to 11 U.S.C. §§ 363(b) and (f) pursuant to that certain order of the Bankruptcy Court authorizing such sale of the Property to be entered in the Primrose and La Sara Cases respectively:

A.   Any and all oil and gas leases in which Seller possess any right, claim, or interest in Willacy County, Texas, and/or Kennedy County, Texas and including but not limited to the 34.5% working interest(s) referenced and described in Schedule B (Docket No. 13) in the Primrose Case (collectively, the "Working Interest Assets") and in various other pleadings filed in the Bankruptcy Case; save and except interests that run with the land and subject to the reservations and provisions contained in that certain Conveyance, Assignment and Bill of Sale from BLAKEnergy, Ltd. et al to Risco La Sara, LLC ("Assignment"), filed in Book 620, Page 1788, et seq of the real property records of the Willacy County, Texas, and the Completion Payment provided for in paragraphs 3.6 and 3.8 of that certain Asset Purchase Agreement, referenced in the Assignment, between BLAKEnergy, Ltd., et al and Risco La Sara, LLC;

B.   The Working Interests Assets shall further include the following:

1) the interests in any units or pooled or communitized lands arising on account of the Working Interests Assets; having been unitized or pooled into such units or with such lands (Seller's interests in such units, the "Unit Interests") (the Working Interest Assets and the Unit Interests are referred to hereinafter as the "Properties");

2) all existing (on or after the date of this Agreement but prior to closing) wells on or attributable to the Properties;

3) all saltwater disposal leases and all saltwater disposal wells located on such saltwater disposal leases contained within the Properties, and any other interest of Seller in any saltwater disposal wells;

4) the interest of the Seller in, to, and against all production facilities, structures, tubular goods, well equipment, lease equipment, production equipment, pipelines, inventory, and all other personal property, fixtures and facilities to the extent appurtenant to or used in connection with the Properties (the "Facilities");

5) to the extent assignable at no cost to Seller, the interest of the Seller in, to, and against all permits, licenses, servitudes, easements, rights-of-way, surface fee interests and other surface use agreements to the extent used in connection with the ownership or operation of the Properties or the Facilities;

6) the hydrocarbons produced from or attributable to the Properties from and after closing and all hydrocarbons produced therefrom prior to closing that are in storage prior to sale and that are upstream of the sales metering point as of closing;

7) all surface rights related to or appurtenant to the Properties; and

8) the interest of the Seller in, to, and against any insurance claims or indemnity rights relating to the Properties.

C.  Any production or payment rights associated with the Working Interest Assets whenever accrued not otherwise described above;

D.  The interest of Seller in the current joint operating agreement ("JOA") covering and applicable to the Working Interest Assets;

E.  any books, records, or other documents related to the Properties in the possession, custody, and/or control of the Seller including but not limited to:

1) the well schematics, well bore logs;

2) all records, files, contracts, orders, agreements, permits, licenses (including all 2D and 3D seismic licenses and data pertaining to the Properties), easements, maps, data, schedules, reports and logs relating to the Properties;

3) all intellectual property, including all copyrights, patents and trademarks, owned, used or licensed by Seller in connection with the Properties and used or held for use exclusively in

---

the ownership and operation of the Properties, including, for the avoidance of doubt all seismic, geological, geochemical or geophysical data owned or licensed by Seller and any of Seller's interpretations of such data, including all interpretations and analysis obtained by, or on behalf of, Seller and/or any of its predecessors in title; for the avoidance of doubt, this shall include any studies, interpretations or analysis performed by consultants or other personnel which were made available to the seller or any of its predecessors in title.

F.   All of Seller's interest in any equipment, machinery or tools applicable to the Working Interest Assets not otherwise described above; and

G.   The following claims and causes of action:

    1)   All claims and causes of action specifically pled as a count in the First Amended Original Complaint filed at Docket Number 21 in Adv. No. 16-3187, Engelhart et al. v. LaSara Ventures 1, LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Adversary Proceeding");

    2)   All claims or causes of action of the Bankruptcy Estates arising from or related to the assets described in paragraphs 2 (A) through (E) above, and all claims or causes of action or defenses, if any, of the Bankruptcy Estate respecting the Completion Payment asserted by BLAKEnergy, Ltd., described in paragraph 9 and 22 hereof;

    3)   but save and except any other claims not otherwise conveyed herein  that the Trustee possesses, or may discover, including, but not limited to, claims against other parties who (i) are not currently defendants in the Adversary Proceeding and (ii) claims against any parties therein but arising from acts and/or occurrences not expressly stated in the First Amended Original Complaint.   By way of example only, and not limitation, this exclusion includes, but is not limited to, avoidance claims related to: (a) funds paid by NNMC, Ltd. under that certain Net Profits Participation Agreement dated October 1, 2014, between NNMC, Ltd, and Primrose La Sara, LLC; or (b) funds formerly on deposit with the Texas Railroad Commission for the account of La Sara Operating Company, LLC.

3.   **SALES PRICE**:   $950,000.00 (the "Sales Price").   Payment of the Sales Price and closing of the sale of the Property are subject to the following:

A.   Stalking Horse Bid:   The parties agree Buyer shall act as a Stalking Horse Bidder at an auction of the Property and that the Sales Price shall be the Stalking Horse Bid in that auction.   If Buyer is the Successful Bidder, or the Backup Successful Bidder, at the auction, the sale provided for herein shall close according to the terms stated herein.

B.   Breakup Fee:   In the event that Buyer is not the Successful Bidder, or the Backup Successful Bidder, that closes on the sale of the Property, this agreement shall terminate and Seller shall pay to Buyer a breakup fee of $60,000.00.   The breakup fee shall be paid no later than the tenth (10th) business day after the sale of the Property closes and the funds paid to Seller have cleared Seller's bank account.

C.  Allocation of Sales Price:   The Sales Price is for the entirety of the Property, with no proration; provided, however, Buyer may internally prorate the Sales Price for accounting purposes.

4.  **EARNEST MONEY:**

A.  Concurrent with the execution of this contract and provision thereof to the Seller, Buyer shall deposit with Seller $1,000.00 as earnest money, which will be applied to the Sales Price at closing. The earnest money shall be paid by cashier's check made payable to Eva. S. Engelhart, Trustee, or wire transfer.   If Buyer is not the Successful Bidder or Backup Successful Bidder that closes on the sale of the Property, all earnest money will be returned to Buyer within seven (7) days after closing by the Successful Bidder without offset of any kind and in addition to the payment of the "breakup fee" provided for herein.   However, if Buyer withdraws from this agreement for any reason prior to the auction, all earnest money will be forfeited.

B.  If Buyer fails to deposit the earnest money as required by this contract, then this contract will immediately terminate and be of no further force and effect.

5.  **PROPERTY CONDITION AND OPPORTUNITY TO INSPECT**:

A.  SELLER MAKES NO REPRESENTATION, WARRANTY, STATEMENT, OR OTHER ASSERTION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY TO BE SOLD, IT'S MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

B.  Buyer will take the Property **AS IS, WHERE IS**, with any and all latent and patent defects.   Buyer shall be fully responsible for making its own evaluation and determination as to any aspect of the Property.   Buyer acknowledges that, having been given the opportunity to inspect and evaluate the Property, said Purchaser will be relying solely on said Purchaser's own investigation and not on any information provided by Seller.

C.  INSPECTION:   Buyer shall have the right of inspection of the Property as Ordered by the Bankruptcy Court in the Order setting the auction of the Property (the "Inspection Period").   Buyer shall have the right to withdraw this offer at any time during the Inspection Period, but not thereafter.

6.  **CLOSING**:   The closing of the sale will be no earlier than 10:00 AM central time on the fifth (5th) business day following the close of the auction of the Property, whenever set by the Court, unless the parties agree in writing to do it sooner (the "Closing Date").   If either party fails to close by the Closing Date, the non-defaulting party may exercise the remedies for in this agreement.

A.  At closing, Seller will execute and deliver, at Seller's expense,  all conveyance and assignment related documents required to consummate this agreement in a form acceptable to the parties.

B.  At closing, Buyer will pay the Sales Price in good funds acceptable to the Seller, unless previously paid in full.

7.      **DEFAULT**:

    A.  If Buyer fails to comply with this Contract, Buyer is in default and Seller may elect to do any or all of the following or a combination thereof:

        i.   retain the earnest money as damages for Buyer's breach; sell the Property to another buyer, and sue for any and all other damages that may result from Buyer's breach;

        ii.  retain the earnest money and terminate the Contract with Buyer;

        iii. seek to enforce specific performance; or seek other relief as may be provided by law.

    B.  If Seller fails to comply with this Contract, Seller is in default and Buyer may as its sole and exclusive remedy, either:

        i.   terminate this Contract and receive the earnest money as liquidated damages, thereby releasing the parties from this Contract; or

        ii.  enforce specific performance only.

    C.  All rights and remedies of Seller under this Paragraph will be cumulative, and none will exclude any other right or remedy provided by law or by any other provision of this Contract.   All rights and remedies of Seller may be exercised and enforced concurrently and whenever, and as often, as occasion for their exercise arises.

8.      **ATTORNEY'S FEES**:   If Buyer or Seller is a prevailing party in any legal proceeding brought under or with relation to this Contract or this transaction, such party is entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorneys' fees.   This Paragraph survives termination of this Contract.

9.      **AGREEMENT OF THE PARTIES**:

    A.  This Contract contains the entire agreement of the parties and may not be changed except in writing. In the event any covenant, condition or provision herein contained is held to be invalid by final judgment of any Court of competent jurisdiction, the invalidity of such covenant, condition or provision shall not in any way affect any other covenant, condition or provision herein contained, which shall continue in full force and effect.

    B.  If this Contract is executed in a number of identical counterparts, each counterpart is an original and all counterparts, collectively, constitute one agreement.

    C.  Buyer may not assign this Contract.

    D.  Jurisdiction regarding any disputes regarding this agreement shall be exclusively in the United States Bankruptcy Court and case in which Seller serves as Chapter 7 Trustee.

    E.  All obligations of the parties created hereunder are performable in Harris County, Texas.   In case any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal, and unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Contract shall be construed as if such invalid,

illegal, or unenforceable provision had never been contained herein. This Contract constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the within subject matter and cannot be changed except by their written consent.  Words of any gender used in this Contract shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

F.  As part of the sale of the Property, Seller shall assume and assign to Buyer all of its right, title and interest in the JOA.

G.  Buyer will assume all obligations associated with the Property and the JOA liabilities on and after the Closing Date. Purchaser will not assume any obligations associated with the Property and the JOA liabilities that existed or accrued prior to the Closing Date.

H.  To any extent necessary under applicable law in order to maintain any of the claims to be assigned described in Paragraph 2(f) above ("Litigation Assets"), and at the discretion of the Buyer, the Seller shall remain a party with respect to the prosecution of any of the Litigation Assets. The Litigation Assets and/or the value of the Litigation Assets shall be conveyed in a manner as to maintain standing or any other rights that are necessary to preserve and prosecute the Litigation Assets for the use and benefit of the Buyer and/or to maintain standing in the Bankruptcy Court; and if necessary in order to preserve venue, jurisdiction, and the ability to enter final orders in the Bankruptcy Court, the assignment of the claims and causes of action and the Adversary Proceeding reference and described in Section 2 above shall be only an assignment of the proceeds, remedies, and recovery of same, and Seller agrees to amend and/or supplement this Agreement and/or execute such other and further documents as may be necessary to effectuate the intentions of this Paragraph H.

I.  Promptly after closing, Seller will provide to Purchaser any books, records, or other documents related to the Subject Assets that are in the possession, custody, and/or control of the Seller, including the products of the Seller's investigation and/or diligence and/or discovery products obtained through and until the Effective Date. Seller will also direct counsel to provide to Purchaser any attorney work product related to the Subject Assets.

10.    This agreement is subject to bankruptcy court approval.

11.    Time is of the essence.

*{remainder of page intentionally blank}*

---

**ASSET PURCHASE AGREEMENT — Page 6**

**Buyer**:

By: _____

_____, _____ of
Tennyson Energy Investment Group, LLC

Title: _____

Date: _____


*{continued on following page}*

**Seller**:

By: _____

<u>Eva S. Engelhart, Trustee and not individually</u>

Date: _____

## BID PROCEDURES

### 1. Property to be Sold

All right, title and interest of Seller in and to the following (hereafter the "Property") free and clear of liens and claims pursuant to 11 U.S.C. §§ 363(b) and (f) pursuant to that certain Court Order entered on _____ at Docket Numbers _____ and _____ in the Primrose and La Sara Cases respectively:

A. Any and all oil and gas leases in which Seller possess any right, claim, or interest in Willacy County, Texas, and/or Kennedy County, Texas and including but not limited to the 34.5% working interest(s) referenced and described in Schedule B (Docket No. 13) in the Primrose Case (collectively, the "Working Interest Assets") and in various other pleadings filed in the Bankruptcy Case;

B. Any production or payment rights associated with the Working Interest Assets whenever accrued;

C. The interest of Seller in the current joint operating agreement ("JOA") covering and applicable to the Working Interest Assets;

D. Copies of any books, records, or other documents related to the Working Interest Assets in the possession, custody, and/or control of the Seller including but not limited to the well schematics and well bore logs;

E. All of Seller's interest in any equipment, machinery or tools applicable to the Working Interest Assets;

F. All claims and causes of action specifically pled as a count in the First Amended Original Complaint filed at Docket Number 21 in Adv. No. 16-3187, *Engelhart et al. v. LaSara Ventures 1, LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Adversary Proceeding"), save an except any other claims the Trustee has, or may discover, including, but not limited to, claims against other parties who are not currently defendants in the Adversary Proceeding and claims against any parties therein but not stated therein.   By way of example only, and not limitation, this exclusion includes, but not limited to, claims related to: (a) funds paid by NNMC, Ltd. under that certain Net Profits Participation Agreement dated October 1, 2014, between NNMC, Ltd, and Primrose La Sara, LLC; or (b) funds formerly on deposit with the Texas Railroad Commission for the account of La Sara Operating Company, LLC.

### 2. Due Diligence

Bidders will be given access to a virtual data room to view the oil and gas leases applicable to the assets being sold; any pending authorization for expenditure for proposed pending operations; lease files; division orders (if any); well files, production history and what seismic information is available.   Bidders desiring to access this information will be required to execute a confidentiality agreement in the form attached as Exhibit 1, hereto.

Bidders will have the opportunity to physically inspect the land, and all operations thereon, applicable to the assets being sold at the dates and times set in the Order approving these Bid

Procedures.  Bidders desiring to access the property will be required to execute the release and indemnity agreement in the form attached as Exhibit 2, hereto.

**3.   Stalking Horse Bidder and Stalking Horse Bid**

Tennyson Energy Investment Group, LLC has agreed to act as the "Stalking Horse Bidder" with regard to the sale of the Property and has submitted a bid of $950,000.00 for the Property.   If the Stalking Horse Bid is not the bid accepted and closed by the Trustee, and the Property is sold to another bidder, then the Stalking Horse Bidder is entitled to a breakup fee of $60,000 from the Estate to be paid at closing of such sale without the necessity of further order of the Court.

**4. Qualified Bid and Qualified Bidder**

In order for a Bid to be qualified, the bidder Trustee must receive, no later than three (3) business days prior to the date of the auction set by the Court, the following:

(a) a signed and executed offer in substantially the same form as Exhibit 3 attached hereto containing no contingencies and setting forth consideration of an amount no less than $60,001,00 in excess of the Stalking Horse Bid.

(b) an earnest money deposit in the amount of $1,000.00 by way of cashier's check payable to Eva S. Engelhart, Trustee, only; and

(c) proof of financial ability to close the transaction.

A Qualified Bidder is one who submits a Qualified Bid.   The Stalking Horse bidder is automatically a Qualified Bidder.

**5. Notice Procedures**

After entry of an Order approving the Trustee's Motion to Auction to which these Bid Procedures are made a part of, the Trustee shall serve notice of the pending auction, and these bid procedures, to any and all persons or entities whom she, in her sole discretion, believes may be interested in making a Qualified Bid.

**6. Auction and Sale**

If the Trustee receives a Qualified Bid, in addition to the Stalking Horse Bid, the Trustee will conduct the Auction to determine the Successful Bidder(s) with respect to the Property. If the Trustee does not receive any Qualified Bids other than the Stalking Horse Bid, the Stalking Horse Bid will be accepted and closed.   The Auction shall take place at **10:00 a.m. (CST) on the 29th day of November 2016,** at the offices of the Trustee at 7700 San Felipe, Suite 550, Houston, Texas 77063 (the "Auction").   The Auction shall be conducted in a timely fashion according to the following procedures:

(a) The Trustee Shall Conduct the Auction.

The Trustee and its professionals shall direct and preside over the Auction. At the start of the Auction, the Stalking Horse Bid shall be considered the first bid.   All incremental Bids made thereafter shall first be a Minimum Overbid and then any Overbids thereafter (both terms defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Trustee shall maintain a written transcript of all Bids made and announced at the Auction, including the Stalking Horse Bid, the Minimum Overbid, all Overbids, and the Successful Bid(s). In order to participate in the Auction, each prospective purchaser must be a Qualified Bidder. Each Qualified Bidder must have at least one individual representative with authority to bind the Qualified Bidder attend the Auction in person. Only Qualified Bidders and their legal and financial advisors shall be entitled to attend and/or bid at the Auction. The Trustee, in her sole discretion, may allow any Qualified Bidder, including the Stalking Horse Bidder, to attend and participate in the auction telephonically or by other electronic means.

(b) Auction Procedures.

A Qualified Bidder wishing to submit a bid higher than the Stalking Horse Bid must bid an amount equal to or greater than the total consideration contained in the Stalking Horse Bidder's Qualifying Bid plus the amount of the Breakup Fee plus $1.00 (the "**Minimum Overbid**").   Subject to the Minimum Overbid, Qualified Bidders shall submit successive Overbids in increments of no less than $10,000.00 (each an "**Overbid**").   Overbids must be in US Dollars only, no other form of consideration will be allowed for an Overbid.

(d) Closing the Auction.

(i) The Auction shall continue until there is only one offer that the Trustee determines is the highest and/or best offer for the purchase of the Property (each a "**Successful Bid**" and such Bidder, the "**Successful Bidder**"), at which point, the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then existing Overbid(s).   The second highest Bid for such assets shall be deemed to be the "**Backup Successful Bid**" and such Bidder, the "**Backup Successful Bidder.**"

(ii) The identity of the Backup Successful Bidder(s) and the amount and material terms of the Backup Successful Bid(s) shall be announced by the Trustee at the conclusion of the Auction at the same time the Trustee announces the identity of the Successful Bidder(s). The Backup Bidder(s) shall be required to keep its or their Qualified Bid(s) (or if the Backup Bidder(s) submitted one or more Overbids at the Auction, its final Overbid(s)) open and irrevocable until the closing of the transaction with the Successful Bidder(s).

(iii) For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Trustee from exercising her fiduciary duties under applicable law.

(iv) The Trustee shall not consider any Bids or Overbids submitted after the conclusion of the Auction and any and all such Bids and Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(e) No Collusion; Good Faith Bona Fide Offer.

Each Qualified Bidder participating at the Auction will be required to confirm on the record that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

(f) Closing the Sale

The Trustee shall be available to promptly close with the Sale following the conclusion of the auction.

## 7. Backup Successful Bidder

If a Successful Bidder fails to consummate an approved transaction contemplated by its Successful Bid, the Trustee may select the applicable Backup Successful Bidder as the Successful Bidder, and such Backup Successful Bidder shall be deemed a Successful Bidder for all purposes. The Trustee will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Successful Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Good Faith Deposit shall be forfeited to the Trustee, and the Trustee specifically reserves the right to seek all available remedies against the defaulting Successful Bidder (or Backup Successful Bidder, if such party shall also breach or fail to perform), as applicable, including with respect to specific performance.

## 8. Consent to Jurisdiction

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction and venue of the United States Bankruptcy Court for the Southern District of Texas, Houston Division and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Confidentiality Agreements, as applicable.

## 9. No Requirement for Sale Hearing

Upon approval of this Bid Procedures by the Bankruptcy Court, no sale approval hearing will be required in order to close the Successful Bid, or any Backup Successful Bid.

## 10. Return of Good Faith Deposits

Earnest money deposited by the Successful Bidder, and any Backup Successful Bid, shall be applied to its Successful Bid at closing.   Until closing of the Successful Bid, or any Backup Successful Bid as the case may be, the earnest money deposit of the Successful Bidder and any Backup Successful Bidder shall be retained by the Trustee.   After closing, the earnest money of any Backup Successful Bidder whose Backup Successful Bid is not closed upon, shall be returned by the Trustee to the Backup Successful Bidder within thirty (30) days.   All Earnest Money shall be held in the Trustee's trust account and shall not be entitled to interest.

# CONFIDENTIALITY AGREEMENT

### La Sara Field
### Harris County, Texas

THIS AGREEMENT, entered into this the_____ day of _____ 2016, by and between MK Operating Company, LLC, (Discloser), and _____ ("Reviewer/Consultant").

1.  In connection with the evaluation and the possible participation by the Reviewer/Consultant in operations within the La Sara Field (hereinafter referred to as the "Prospect"), the Discloser is willing, in accordance with the terms and conditions of this Agreement, to disclose to the Reviewer/Consultant certain information which Discloser claims to be proprietary and/or confidential, relating to the Prospect consisting of geological, geophysical, engineering and land data, maps, and interpretations (hereinafter referred to as the "Confidential Information").

2.  In consideration of the disclosure referred to in paragraph 1 hereof, the Reviewer/Consultant agrees not to disclose the Confidential Information in any manner whatsoever, including by means of photocopy or reproduction, without the Discloser's prior written consent, except as provided in paragraphs 3 and 4 below.

3.  The Reviewer/Consultant may disclose the Confidential Information without the Discloser's prior written consent only to the extent such Confidential Information:

    (a)  is or becomes part of the public domain through no fault of the Reviewer/Consultant;

    (b)  was in the Reviewer/Consultant's possession prior to the time it was acquired hereunder; or

    (c)  is or was acquired independently from a third party that represents that it has the right to disseminate such Confidential Information.

4.  The Reviewer/Consultant shall be entitled to disclose the Confidential Information without the Discloser's prior written consent to each of the following persons ("Reviewer/Consultant Representatives") who have a clear need to know in order to evaluate the Prospect:

    (a)  employees, officers and directors of the Reviewer/Consultant;

    (b)  any affiliate of Reviewer/Consultant. As used herein, "affiliate" means, with respect to any person or entity, any other person or entity that, directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with, such person or entity. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation, the right to exercise, directly or indirectly, fifty percent (50%) or more of the voting rights attributable to the shares of the controlled corporation or, with respect to a person or entity other than a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled person or entity;

    (c)  any consultant or agent retained by the Reviewer/Consultant for the purpose of evaluating the Confidential Information; or

      (d)      any bank financing Reviewer/Consultant's participation in the Prospect, including any consultant retained by such bank for the purpose of evaluating the Confidential Information.

Prior to making any such disclosures to persons under subparagraphs (c) and (d) above, however, the Reviewer/Consultant shall obtain from each such person an under taking confidentiality containing the same obligations of confidentiality as contained in this Agreement.

5.      The Reviewer/Consultant shall only use or permit the use of the Confidential Information to evaluate the Prospect and determine whether to enter into negotiations concerning participation in, or further evaluation of, the Prospect; provided, however, that the Reviewer/Consultant may use its own mental impressions, if any, of the Confidential Information in acquiring, developing and evaluating exploration opportunities, interests or properties outside the Prospect.

6.      The Reviewer/Consultant agrees to take such action as necessary to see that all persons to whom the Confidential Information is disclosed under this Agreement shall not disclose the Confidential Information to any unauthorized person.

7.      The Confidential Information shall remain the property of the Discloser, and the Discloser may demand the return thereof at any time upon giving written notice to the Reviewer/Consultant. Within fifteen (15) days of receipt of such notice, the Reviewer/Consultant shall return all of the original Confidential Information and shall destroy all copies, reproductions, notes and maps (both written and electronic) concerning the Prospect in its possession and in the possession of persons to whom it was provided hereunder.

8.      If the Reviewer/Consultant participates in the Prospect, then this Agreement shall terminate automatically on the date the Reviewer/Consultant enters into a definitive agreement with Discloser relating to the exploration and development of the Prospect, which contains provisions covering the confidentiality of data in the Prospect. If Discloser and Reviewer/Consultant do not enter into a definitive agreement regarding the exploration and development of the Prospect, it is agreed that, for a period of **one (1) year** from the date hereof, Reviewer/Consultant (including its affiliates and subsidiaries) will not directly or indirectly acquire any interest in the lands or leases located within the Prospect or any option applicable thereto, without the prior written consent of Discloser.

9.      Reviewer/Consultant shall be solely responsible for any actions which it takes, or advises others to take, in reliance on the Confidential Information furnished by Discloser. REVIEWER/CONSULTANT OR REVIEWER/CONSULTANT'S REPRESENTATIVES AND OTHER PERSONS OR PARTIES ACTING UNDER OR THROUGH REVIEWER/CONSULTANT RELEASE DISCLOSER, ITS PARENT CORPORTION, ITS SUBSIDIARIES OR AFFILIATES, OR ANY OF THEIR EMPLOYEES, AGENTS OR REPRESENTATIVES ("DISCLOSER PARTIES") FROM ANY LIABILITY WHATSOEVER RESULTING FROM THE SELECTION, USE OR RELIANCE ON THE CONFIDENTIAL INFORMATION BY REVIEWER/CONSULTANT OR ANY OF REVIEWER/CONSULTANT'S REPRESENTATIVES OR SUCH OTHER PERSONS OR PARTIES ACTING BY OR THROUGH REVIEWER/CONSULTANT (INCLUDING, WITHOUT LIMITATION, SUCH SELECTION OR USE AS REVIEWER/CONSULTANT OR REVIEWER/CONSULTANT'S REPRESENTATIVES MAY DEEM NECESSARY IN ORDER TO PARTICIPATE IN THE PROSPECT).

10.      Discloser represents and warrants that it has the right to disclose the Confidential Information under the terms and conditions of this Agreement without violating the legal

rights of, or its contractual obligations to, any third party. REVIEWER/CONSULTANT UNDERSTANDS THAT DISCLOSER MAKES NO OTHER EXPRESS WARRANTY, AND DISCLAIMS ALL IMPLIED WARRANTIES, WITH RESPECT TO THE CONFIDENTIAL INFORMATION OR THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES AS TO (i) THE QUALITY, ACCURACY OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION, (ii) THE PRESENCE OF HYDROCARBONS WITHIN THE PROPERTIES OR (iii), THE RESULTS WHICH MIGHT BE EXPECTED FROM ANY EXPLORATION, DEVELOPMENT, PRODUCTION AND/OR HYDROCARBON MARKETING ACTIVITIES INVOLVING THE PROPERTIES. NOTHING CONTAINED IN THE CONFIDENTIAL INFORMATION IS OR SHALL BE RELIED UPON AS A PROMISE, REPRESENTATION OR WARRANTY, WHETHER AS TO THE PAST, PRESENT OR FUTURE PRODUCTION OR PRODUCTION POTENTIAL INVOLVING THE PROPERTIES.

11.   THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUSIVE OF ANY CONFLICT OF LAW PRINCIPLES WHICH WOULD DIRECT THE APPLICATION OF THE LAWS OF A DIFFERENT STATE OR OTHER JURISDICTION.

12.   No subsequent amendments, changes or modifications to this Agreement shall be valid unless they are in writing and signed by a duly authorized representative of each of the parties hereto.

13.   This Agreement comprises the full and complete agreement of the parties hereto with respect to the disclosure of the Confidential Information and supersedes and cancels all prior communications, understandings and agreements between the parties hereto, whether written or oral, expressed or implied.

14.   Neither party shall be liable in an action initiated by one against the other for any special, indirect, punitive or consequential damages resulting from or arising out of this Agreement or any breach thereof. Further, there shall be no third party beneficiaries to this Agreement.

15.   Notwithstanding anything to the contrary contained herein, Reviewer/Consultant may disclose the Confidential Information, and provide copies thereof, to agencies of federal, state and local governments to the extent required by applicable, final, non-appleable, order, law, rule or regulation, and may disclose Confidential Information pursuant to valid, compulsory and final legal process, provided that Reviewer/Consultant shall (i) promptly advise Discloser of each requirement, request, demand, or order for the Confidential Information, (ii) make or, at Discloser's option, allow Discloser to make reasonable objections as permitted by applicable laws, rules and regulations to such disclosures, (iii) take reasonable measures to ensure the confidential treatment of the Confidential Information which must be disclosed, and (iv) disclose only that portion of the Confidential Information which it is legally obligated to disclose. In matters covered by this provision, Reviewer/Consultant shall be entitled to rely on the written advice of its legal counsel.

16.   The Confidential Information may include Discloser proprietary information ("Discloser Information") and information licensed by Discloser from third parties ("Speculative Information"). Subject to the provisions of paragraph 8, this Agreement and all obligations arising herefrom shall terminate **one (1) year** after the date first above written as to Discloser Information. As to Speculative Information, this Agreement shall continue for the time periods specified in the relevant license agreement(s) between Discloser and licensor(s) existing as of the effective date hereof, to the extent that such license

agreements restrict Discloser thereunder and if such time periods are clearly shown on or reflected in the Speculative Information.

17.    The rights and obligations under this Agreement may not be assigned by either party without the express written consent of the other party, but so assigned, it shall be binding on the heirs, successors and assigns.

(*The remainder of this page intentionally left blank*)

IN WITNESS WHEREOF, the duly authorized representative of each party has caused this Agreement to be executed and made effective as of the date first above-written.

**DISCLOSER**                                    **REVIEWER/CONSULTANT**

**MK Operating Company, LLC**                    Company Name:_____

By: _____                      By:_____

Print Name:_____                    Print Name:_____

Title: _____                   Title:_____

## MK Operating Company, LLC
### Two Riverway, Suite 1700
### Houston, Texas 77056
### 713-728-6315
### 713-583-0965 Fax

_____, 2016

**VIA EMAIL:**
Name
Company
Address
City, State Zip

Re:     Permission for Access to MK Operating Company, LLC properties in Willacy County,
        Texas.

Dear _____:

  MK Operating Company, LLC ("MK") hereby grants you and your company's representatives permission to perform field inspections of our operated wells (hereinafter referred to as the "Properties") located in Willacy County, Texas.  Field inspections will be conducted only on specified dates and times with a representative of MK present at all times. Said field inspections will be only for those operated wells located on the Crane/Mallard Lease dated December 1, 2001, from Fausto Yturria, Jr., et al, to Swift Energy Company and covering 2,975.8 acres, more or less, situated in the "San Juan De Carricitos" Jose Narcisco Cabazos Grant, A-8, Willacy County, Texas, and the RoadRunner Lease dated April 11, 2001, from Fausto Yturria, Jr. et al to BLAKEnergy, Ltd., as amended, and covering 2,975.8 acres, more or less, situated in the "San Juan De Carricitos" Jose Narcisco Cabazos Grant, A-8, and the "Las Mestenas Petitas Y La Abra" Vincent Hinojosa Survey, A-4 and Willacy County, Texas. It is agreed and understood that you and/or your company's representatives shall access the Properties at your sole risk and shall fully release MK, its employees and subcontractors from any harm you and/or your company's representatives may suffer while on the Properties pursuant to this agreement. This release of liability is intended to operate and be applicable even if it is alleged or proved that all or some of the damages being sought were caused in whole or in part by any act, omission, negligence, gross negligence, breach of contract, intentional conduct, violations of statute or common law, breach of warranty, product defect, strict liability or any other conduct whatsoever of MK.

Furthermore, you agree to execute the attached confidentiality agreement and be bound by such agreement.

You can contact the undersigned at the above numbers with any questions or comments regarding this matter.

Date
Permission to Access La Sara Field
Page 2


Regards,
MK Operating Company, LLC



Julian Ayala
Land Manager



**Agreed:**


_____
Name
Company


_____
Name
Company

## ASSET PURCHASE AGREEMENT

1.    **PARTIES**:  Subject to the terms stated herein, Seller agrees to sell and assign, transfer, set over and/or convey to Buyer the Property described in Paragraph 2.  Buyer agrees to buy the Property from Seller for the sales price stated in Paragraph 3.   The parties to this contract are:

Seller:  Eva S. Engelhart, Trustee of the Chapter 7 Estates of Primrose La Sara, LLC, Case No. 16-30822 (the "Primrose Estate" or "Primrose Case") and La Sara Operating Company, LLC, Case No. 16-30453 (the "La Sara Estate" or "La Sara Case") (the Primrose Estate and the La Sara Estate together are referred to hereinafter as the "Bankruptcy Estates"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division and not in her individual capacity ("Seller").

Address:   7700 San Felipe, Suite 550, Houston, Texas 77063
Phone:     (713) 626-1200        Fax:      (713) 623-6014
email:      eengelhart@rossbanks.com

Buyer:  _____
_____
Address:   _____
_____
Phone:     (___) ___-____     Fax:   (___) ___-____
email:      _____

2.    **PROPERTY**:  All right, title and interest of Seller in and to the following identified property (hereafter the "Property") free and clear of liens and claims pursuant to 11 U.S.C. §§ 363(b) and (f) pursuant to that certain order of the Bankruptcy Court authorizing such sale of the Property to be entered in the Primrose and La Sara Cases respectively:

A.  Any and all oil and gas leases in which Seller possess any right, claim, or interest in Willacy County, Texas, and/or Kennedy County, Texas, and including but not limited to the 34.5% working interest(s) referenced and described in Schedule B (Docket No. 13) in the Primrose Case (collectively, the "Working Interest Assets") and in various other pleadings filed in the Bankruptcy Case; save and except interests that run with the land and subject to the reservations and provisions contained in that certain Conveyance, Assignment and Bill of Sale from BLAKEnergy, Ltd. et al to Risco La Sara, LLC ("Assignment"), filed in Book 620, Page 1788, et seq of the real property records of the Willacy County, Texas, and the Completion Payment provided for in paragraphs 3.6 and 3.8 of that certain Asset Purchase Agreement, referenced in the Assignment, between BLAKEnergy, Ltd., et al and Risco La Sara, LLC;

B.  The Working Interests Assets shall further include the following:

1)  the interests in any units or pooled or communitized lands arising on account of the Working Interests Assets; having been unitized or pooled into such units or with such lands (Seller's interests in such units, the "Unit Interests") (the Working Interest Assets and the Unit Interests are referred to hereinafter as the "Properties");

2)  all existing (on or after the date of this Agreement but prior to closing) wells on or attributable to the Properties;

3)  all saltwater disposal leases and all saltwater disposal wells located on such saltwater disposal leases contained within the Properties, and any other interest of Seller in any saltwater disposal wells;

4)  the interest of the Seller in, to, and against all production facilities, structures, tubular goods, well equipment, lease equipment, production equipment, pipelines, inventory, and all other personal property, fixtures and facilities to the extent appurtenant to or used in connection with the Properties (the "Facilities");

5)  to the extent assignable at no cost to Seller, the interest of the Seller in, to, and against all permits, licenses, servitudes, easements, rights-of-way, surface fee interests and other surface use agreements to the extent used in connection with the ownership or operation of the Properties or the Facilities;

6)  the hydrocarbons produced from or attributable to the Properties from and after closing and all hydrocarbons produced therefrom prior to closing that are in storage prior to sale and that are upstream of the sales metering point as of closing;

7)  all surface rights related to or appurtenant to the Properties; and

8)  the interest of the Seller in, to, and against any insurance claims or indemnity rights relating to the Properties.

C.  Any production or payment rights associated with the Working Interest Assets whenever accrued not otherwise described above;

D.  The interest of Seller in the current joint operating agreement ("JOA") covering and applicable to the Working Interest Assets;

E.  any books, records, or other documents related to the Properties in the possession, custody, and/or control of the Seller including but not limited to:

1)  the well schematics, well bore logs;

2)  all records, files, contracts, orders, agreements, permits, licenses (including all 2D and 3D seismic licenses and data pertaining to the Properties), easements, maps, data, schedules, reports and logs relating to the Properties;

3)  all intellectual property, including all copyrights, patents and trademarks, owned, used or licensed by Seller in connection with the Properties and used or held for use exclusively in the ownership and operation of the Properties, including, for the avoidance of doubt all seismic, geological, geochemical or geophysical data owned or licensed by Seller and any of Seller's interpretations of such data, including all interpretations and analysis obtained by, or on behalf of, Seller and/or any of its predecessors in title; for the avoidance of doubt,

---

**ASSET PURCHASE AGREEMENT — Page 2**
APA - Non-Stalking Horse Version

this shall include any studies, interpretations or analysis performed by consultants or other personnel which were made available to the seller or any of its predecessors in title.

F.   All of Seller's interest in any equipment, machinery or tools applicable to the Working Interest Assets not otherwise described above; and

G.   The following claims and causes of action:

    1)   All claims and causes of action specifically pled as a count in the First Amended Original Complaint filed at Docket Number 21 in Adv. No. 16-3187, Engelhart et al. v. LaSara Ventures 1, LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Adversary Proceeding");

    2)   All claims or causes of action of the Bankruptcy Estates arising from or related to the assets described in paragraphs 2 (A) through (E) above, and all claims or causes of action or defenses, if any, of the Bankruptcy Estate respecting the Completion Payment asserted by BLAKEnergy, Ltd., described in paragraph 9 and 22 hereof;

    3)   but save and except any other claims not otherwise conveyed herein  that the Trustee possesses, or may discover, including, but not limited to, claims against other parties who (i) are not currently defendants in the Adversary Proceeding and (ii) claims against any parties therein but arising from acts and/or occurrences not expressly stated in the First Amended Original Complaint.   By way of example only, and not limitation, this exclusion includes, but is not limited to, avoidance claims related to: (a) funds paid by NNMC, Ltd. under that certain Net Profits Participation Agreement dated October 1, 2014, between NNMC, Ltd, and Primrose La Sara, LLC; or (b) funds formerly on deposit with the Texas Railroad Commission for the account of La Sara Operating Company, LLC.

3.   **SALES PRICE**:   $_____ (the "Sales Price").   Payment of the Sales Price and closing of the sale of the Property are subject to the following:

A.   <u>Allocation of Sales Price</u>:   The Sales Price is for the entirety of the Property, with no proration; provided, however, Buyer may internally prorate the Sales Price for accounting purposes.

4.   **EARNEST MONEY:**

A.   Concurrent with the execution of this contract and provision thereof to the Seller, Buyer shall deposit with Seller $1,000.00 as earnest money, which will be applied to the Sales Price at closing. The earnest money shall be paid by cashier's check made payable to Eva. S. Engelhart, Trustee, or wire transfer.   If Buyer is not the Successful Bidder or Backup Successful Bidder that closes on the sale of the Property, all earnest money will be returned to Buyer within seven (7) days after closing by the Successful Bidder without offset of any kind and in addition to the payment of the "breakup fee" provided for herein.   However, if Buyer withdraws from this agreement for any reason prior to the auction, all earnest money will be forfeited.

B.   If Buyer fails to deposit the earnest money as required by this contract, then this contract will

immediately terminate and be of no further force and effect.

5.    **PROPERTY CONDITION AND OPPORTUNITY TO INSPECT**:

A.  SELLER MAKES NO REPRESENTATION, WARRANTY, STATEMENT, OR OTHER ASSERTION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY TO BE SOLD, IT'S MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

B.  Buyer will take the Property **AS IS, WHERE IS**, with any and all latent and patent defects.   Buyer shall be fully responsible for making its own evaluation and determination as to any aspect of the Property.   Buyer acknowledges that, having been given the opportunity to inspect and evaluate the Property, said Purchaser will be relying solely on said Purchaser's own investigation and not on any information provided by Seller.

C.  INSPECTION:   Buyer shall have the right of inspection of the Property as Ordered by the Bankruptcy Court in the Order setting the auction of the Property (the "Inspection Period").   Buyer shall have the right to withdraw this offer at any time during the Inspection Period, but not thereafter.

6.    **CLOSING**:   The closing of the sale will be no earlier than 10:00 AM central time on the fifth (5th) business day following the close of the auction of the Property, whenever set by the Court, unless the parties agree in writing to do it sooner (the "Closing Date").   If either party fails to close by the Closing Date, the non-defaulting party may exercise the remedies for in this agreement.

A.  At closing, Seller will execute and deliver, at Seller's expense, all conveyance and assignment related documents required to consummate this agreement in a form acceptable to the parties.

B.  At closing, Buyer will pay the Sales Price in good funds acceptable to the Seller, unless previously paid in full.

7.    **DEFAULT**:

A.  If Buyer fails to comply with this Contract, Buyer is in default and Seller may elect to do any or all of the following or a combination thereof:

    i.  retain the earnest money as damages for Buyer's breach; sell the Property to another buyer, and sue for any and all other damages that may result from Buyer's breach;
    ii.  retain the earnest money and terminate the Contract with Buyer;
    iii.  seek to enforce specific performance; or seek other relief as may be provided by law.

B.  If Seller fails to comply with this Contract, Seller is in default and Buyer may as its sole and exclusive remedy, either:

    i.  terminate this Contract and receive the earnest money as liquidated damages, thereby releasing the parties from this Contract; or
    ii.  enforce specific performance only.

C.  All rights and remedies of Seller under this Paragraph will be cumulative, and none will exclude any other right or remedy provided by law or by any other provision of this Contract.   All rights and remedies of Seller may be exercised and enforced concurrently and whenever, and as often, as occasion for their exercise arises.

8.      **ATTORNEY'S FEES**:   If Buyer or Seller is a prevailing party in any legal proceeding brought under or with relation to this Contract or this transaction, such party is entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorneys' fees.   This Paragraph survives termination of this Contract.

9.      **AGREEMENT OF THE PARTIES**:

A.  This Contract contains the entire agreement of the parties and may not be changed except in writing. In the event any covenant, condition or provision herein contained is held to be invalid by final judgment of any Court of competent jurisdiction, the invalidity of such covenant, condition or provision shall not in any way affect any other covenant, condition or provision herein contained, which shall continue in full force and effect.

B.  If this Contract is executed in a number of identical counterparts, each counterpart is an original and all counterparts, collectively, constitute one agreement.

C.  Buyer may not assign this Contract.

D.  Jurisdiction regarding any disputes regarding this agreement shall be exclusively in the United States Bankruptcy Court and case in which Seller serves as Chapter 7 Trustee.

E.  All obligations of the parties created hereunder are performable in Harris County, Texas.   In case any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal, and unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Contract shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. This Contract constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the within subject matter and cannot be changed except by their written consent.   Words of any gender used in this Contract shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

F.  As part of the sale of the Property, Seller shall assume and assign to Buyer all of its right, title and interest in the JOA.

G.  Buyer will assume all obligations associated with the Property and the JOA liabilities on and after the Closing Date. Purchaser will not assume any obligations associated with the Property and the JOA liabilities that existed or accrued prior to the Closing Date.

H.  To any extent necessary under applicable law in order to maintain any of the claims to be assigned described in Paragraph 2(f) above ("Litigation Assets"), and at the discretion of the Buyer, the Seller shall remain a party with respect to the prosecution of any of the Litigation Assets. The

**ASSET PURCHASE AGREEMENT — Page 5**
APA - Non-Stalking Horse Version

Litigation Assets and/or the value of the Litigation Assets shall be conveyed in a manner as to maintain standing or any other rights that are necessary to preserve and prosecute the Litigation Assets for the use and benefit of the Buyer and/or to maintain standing in the Bankruptcy Court; and if necessary in order to preserve venue, jurisdiction, and the ability to enter final orders in the Bankruptcy Court, the assignment of the claims and causes of action and the Adversary Proceeding reference and described in Section 2 above shall be only an assignment of the proceeds, remedies, and recovery of same, and Seller agrees to amend and/or supplement this Agreement and/or execute such other and further documents as may be necessary to effectuate the intentions of this Paragraph H.

I.  Promptly after closing, Seller will provide to Purchaser any books, records, or other documents related to the Subject Assets that are in the possession, custody, and/or control of the Seller, including the products of the Seller's investigation and/or diligence and/or discovery products obtained through and until the Effective Date. Seller will also direct counsel to provide to Purchaser any attorney work product related to the Subject Assets.

10.   This agreement is subject to bankruptcy court approval.

11.   Time is of the essence.

*{remainder of page intentionally blank}*

**Buyer**:

By: _____
         _____, _____of
         _____

Title: _____

Date: _____

*{continued on following page}*

**Seller**:

By: _____

Eva S. Engelhart, Trustee and not individually

Date: _____